IN RE ADOPTION OF WRIGHT.

[Cite as In re Adoption of Wright, 15 Ohio Misc. 354.]

(No. 71B—Decided April 25, 1968.)

Probate Court of Lake County.

POLLOCK, J. This matter came on to be heard on the allegation in the petition of Horace W. and Lucille Parnwell to adopt their grandson, William E. Wright, Jr., that the father, William E. Wright, had wilfully failed to properly support and maintain said child for a period of more than two years immediately preceding filing of their petition. This issue is separate and distinct from the merits

of the adoption itself and must be resolved before the desirability of the adoption itself can even be considered. The reported cases all seem to indicate that the court allowed evidence on the merits of the adoption to be considered contemporaneously with the non-support issue but it appears to this court that the issues are separate and distinct and a determination of the first issue must be first resolved. The court will not proceed with the adoption itself until the time for appeal is past on the non-support issue or the appeal is finally determined, if one is taken.

Before proceeding to consider the merits of the question at issue, the court will comment on a written motion submitted by the father, William E. Wright. The motion challenged the jurisdiction of the court for the reason that the petitioners had not complied with Section 5103.16, Revised Code, in that the placement of the child was not approved as required by that section. The motion was overruled and the hearing proceeded. The court did not assign a reason for his ruling at the time but now would like to point out that according to the petition the child was placed in the petitioner's home on October 20, 1959. At that time Section 5103.16, Revised Code, did not require court approval, and did permit placement of a child over two years of age with persons related by blood or marriage so that on the date mentioned the placement was not illegal. The section then in effect was enacted effective October 1, 1953, and continued in effect until October 27, 1961, when the section was changed to incorporate the provision requiring court approval of the placement. It might also be noted that this section was again changed effective November 11, 1965, to restore the authority to the Probate Court to proceed under Section 3107.08, Revised Code, to legalize a so-called illegal placement.

Coming now to the merits of the case, the evidence showed that William's father and mother resided for some time after their marriage with her parents, the petitioners, that they did eventually move to their own home, that soon thereafter they separated and William's mother returned with William to her parent's home. On September 9, 1957, William's parents were divorced, he then being four years

of age and his father was ordered to pay $15.00 per week and medical expenses for his support. Mr. Wright did pay the required support regularly until October 20, 1959, at which time Mrs. Wright died. William was then six years old.

After Mrs. Wright's death the child continued to live in his grandparent's home without any arrangements being made between them and his father. He discontinued paying the fifteen dollars per week and in fact made no money payments whatever to the grandparents. He did say to them "If the boy needs something let me know." The offer may have been repeated on other occasions but the grandparents never made any request. According to Mrs. Parnwell, she would not have refused if it had been offered but she never asked him for money or anything else as she felt that it was his responsibility. Mr. Wright has been regularly employed for many years at T. R. W., Inc., and earned about nine thousand dollars in 1966 and ten thousand in 1967.

Mr. Wright did buy his son clothes at Christmas time, the value last year being about $75.00, and various other gifts such as a sleeping bag and a bicycle. He did attempt to establish a relationship with his son by taking part in scouting and attempting to interest his son in that and they went on a campout. On one occasion the boy stayed at his father's home for a short time and his father asked him to come and live in his home and he had made the same request on many occasions. William decided against this on every occasion. The father had remarried and had their own home in which they provided a bedroom for his son.

Within the last year William became involved in some misbehaviour at school and started to play a truant and as a result came before the Juvenile Court. That court placed him in detention for thirty days and suspended twenty of the days, and while he was in detention his father came to see him two or three times. At other times when his grandparents had problems with his discipline, they apparently called on the father to talk to his son. It apparently was at this time of his detention that William requested his

grandparents to adopt him and he requested his father to give his consent. His father declined to consent and hence this hearing.

There are quite a few cases in Ohio dealing with the problem of wilful failure to support but few of them seem to throw much light on the set of facts involved here. There is no doubt that Mr. Wright failed to support his son but is it *wilful* failure within the meaning of Section 3107.06, Revised Code? The following cases have some elements in common with the case at hand.

*In re: Adoption of Gates* (1948), 53 Ohio Law Abs. 315, Court of Appeals of Shelby County.

The petition for adoption used the words "proper support" and omitted "wilful failure" and the same wording was carried into the journal. On review the Appellate Court reversed the Probate Court and in its opinion at page 317 says:

"The word 'wilfully' as used in the statute has a definite meaning which requires that the neglect of the parents be intentional. Without the word being used the neglect of duty could be caused by carelessness and neglect and therefore be unintentional. With the word being used the degree of neglect of duty is much higher."

*Poet* v. *Rosinski*, 60 Ohio Law Abs. 513 (Cuyahoga App. 1951).

Syl. 1.

"The 'mere failure' in and of itself 'to pay for support of minor children' does not under Section 10512-14, General Code, 'constitute wilfulness' so that the consent of parents is not required before a final decree of adoption is entered by the court."

Syl. 2.

"It is not the province of a reviewing court to reverse a judgment simply because the evidence is conflicting."

In this case the Probate Court had held that there was wilful failure and the Court of Appeals declined to reverse on the weight of the evidence.

*In re Adoption of Earhart*, 117 Ohio App. 73 (Miami Co. 1961).

The opinion of Judge Kerns in that case does not dis-

close how the child Cathy was placed in the adoptive home but it is clear that her mother had initiated two habeas corpus proceedings in the Common Pleas Court of Miami County to secure possession of her illegitimate child and had twice been involved in two criminal actions in an attempt to secure possession of the person of her child. Nothing is said about money payments and the court assumes that none were made. Paragraph one of the syllabus of the case reads as follows:

"1. The words 'wilfully failed to properly support and maintain,' as used in Section 3107.06, Revised Code, in regard to circumstances in which consent of a parent to the adoption of a child is not necessary, imply more than a *mere* failure to provide financial support. Such failure to 'properly support and maintain' such child must be intentional."

The adoption was refused by the Probate Court, its judgment sustained in the Court of Appeals and motion to certify the record was overruled.

*In re: Adoption of Shaw*, 91 Ohio App. 347 (Brown County, 1950).

Here the mother of Betty Lou Dyer made arrangements with Mr. and Mrs. Shaw before Betty was born to take the infant into their home. The Dyers at the time had five other children. Later the Dyers were divorced and Mr. Dyer was given custody of all five children. After the divorce Mrs. Dyer remarried but lived without any children in her home. At one time the Shaws took the infant back to Mrs. Dyer because they were becoming too attached to it and were told to keep her. Neither Mr. or Mrs. Dyer has ever supported, maintained or otherwise contributed to the maintenance of the child and no demand was ever made for the same. The Shaws treated the child at all times as their own.

When Betty was 12 years old she visited her mother for a week or two and the mother than decided she wanted Betty in her home. The Shaws then initiated the adoption proceedings and Mr. Dyer filed his written consent but the mother refused and contested the action. The Probate

Court allowed the adoption and the matter was appealed.

At page 352 of the opinion the court says:

"The solution of this appeal depends solely upon the interpretation of the word 'wilfully' as applied to the conduct of the dissenting mother, the appellant here."

Again at page 355 of the opinion is the following:

"The welfare of this child must not be lost sight of. Maintaining and supporting a child means a great deal more than furnishing the material necessities. This mother, the appellant, has wilfully failed and refused to furnish that for which there is no substitute—maternal affection and motherly conduct."

The judgment of adoption was affirmed.

Coming now to apply the law of Ohio as stated in the above quoted decisions to the facts of the instant case, what is the conclusion? The evidence discloses that Mr. Wright never paid any support money to the grandparents and they never asked for any. He told them at the time his wife died and on numerous occasions thereafter to call on him if they needed any money for the boy's care. They never asked for any money and felt that it was his duty to pay without any request. Both families had an adequate income to permit them to live comfortably so there is no question of financial hardship either on the father to have paid or on the grandparents in maintaining William without financial assistance. It seems to the court that there was a mutual failure of duty on the part of both. The father should have continued sending support money to the grandparents after his former wife's death as he was unable at the time to provide a home for his son. On the other hand, there was certainly some duty on the grandparents to indicate their expectation of assistance. It seems unfair for a person or family to take a child into their home and maintain absolute silence as to their expectation of maintenance even though it is offered and after lulling a parent into a feeling of relief from a responsibility, use the failure to support as a device to deprive the parent of his rights as a parent. The courts have repeatedly confirmed this conviction as indicated in

the above cited cases when they have said that "mere failure" to support is not enough. The facts of this case certainly bring it within the provisions of the statute on the question of money payments alone.

The decided cases emphasize the thought that wilful failure to support means personal attention, the display of affection and guidance on the part of the parent and in the *Earhart case* desperate attempts to gain possession of the person of the child. Here again the facts in this case are in the grey zone—neither black nor white. The father did buy his son substantial gifts, he did visit him occasionally, he did respond to grandmother's request on a few occasions to assist in the boy's discipline and did visit him in detention and counseled with him, he did provide a room in his home for the boy and on several occasions urge him to come and live with him and his stepmother, he did take him on a few trips and went into scouting to try and establish a common bond, he did execute a last will and testament in which he made some provision for William and he is now in court resisting this adoption because he still wants William to be his son. There was nothing in the evidence to indicate that Mr. Wright would fail to measure up to the requirements of a good average father or that the stepmother would not attempt to treat William kindly. Both apparently expected more gentlemanly conduct on William's part than he was accustomed to display and this could account for his reluctance to live in their home.

The court restricted the evidence in this case to one issue—of wilful failure to properly support and maintain and did not permit counsel to go into the merits of the adoption but inevitably evidence did creep in as to the suitability of the grandparents as adoptive parents and while there is a suspicion that they may have been over-tolerant in the matter of discipline there is nothing to indicate but what they are fine people and have given the boy a good home and would continue to do so if the adoption were consummated. However, since the issues have been restricted, as this court thinks they should be to the sole

question of allowing the adoption without parent's consent, the issue cannot be decided as it has been in many adoption cases on what is best for the child.

It seems to the court that the facts here are about as near in equipoise as it is possible to get them. It is the opinion of the court that an adoption petition is no different than any other petition filed in a court which requires a judicial determination and that the burden of proof is on the petitioner to establish his right to the relief sought by whatever burden of proof is required in the particular action. In this case a simple preponderance is sufficient but it is the opinion of the court that the petitioners have failed to establish their allegation of wilful failure to properly support and maintain this child by that degree of proof. This court cannot and does not make any decision as to the future custody of the child or the relationship of the parties involved in this matter.

Counsel for the father of William Wright, Jr., may draw a journal dismissing the petition for the reason that the said action cannot proceed for lack of consent of the father, the costs to be assessed against the petitioners.