In re Adoption of Patricia Sargent.

(No. 22932—Decided October 7, 1970.)

Common Pleas Court of Preble County.

*Messrs. Dye & Ernst* and *Mr. John V. Dye, Jr.*, for petitioners.
*Mr. Anthony Valen*, for parents.

Ziegel, J.  On April 16, 1970, Estil and Lillian Ruth Sargent filed their petition to adopt Patricia Shelton, a fourteen year old girl, the daughter of George and Doris Shelton, alleging that the Sheltons have willfully failed to properly support and maintain said child for a period of more than two years immediately preceding the filing of this petition. R. C. 3107.06 (B) (4).  This matter now

pends upon that allegation alone, it being necessary to dispose of the consent question before any other aspect of the adoption may be considered.

From the testimony it appears that the Sheltons moved next door to the Sargents in November 1965. The Sargents have seven children, among whom is Patricia, the child in question. Sometime during the summer of 1966 Patricia began to spend a lot of time in the Sargent household, occasionally staying overnight. While at that time Mrs. Sargent was recovering from surgery and Patricia did some small chores around the Sargent home for which she was paid small amounts, it would appear that she visited often with the Sargents not just because she received some money but also because she enjoyed being with them. In May 1967, the Sargents moved to another home a couple of miles away. Until February 1968, these two families visited, although Patricia only spent one night with the Sargents during this period.

In November 1967, Mr. Shelton was laid off work, and he did not work again until April 1968. In February 1968, their home was foreclosed and they had to move, which they did on March 6, 1968. Patricia did not want to change schools, and with the concurrence of all concerned, arrangements were made for her to live with the Sargents until school was out that year. In May 1968, the Sheltons took bankruptcy.

The time for Patricia to stay with the Sargents was extended so that Patricia could accompany Mrs. Sargent to Florida on a vacation trip. After the return from the Florida trip sometime in July 1968, the Sheltons took Patricia home where she stayed for one weekend. Just what happened at this point is not clear. The Sargents packed her clothes and told Mr. Shelton to come and get them. According to Mrs. Sargent, Mr. Shelton begged her to reconsider and to take her back. At any rate Patricia returned to the Sargents. Shortly before school started in 1968 further discussion was had between these two families. According to Mrs. Sargent she had decided that they could not keep Patricia on the same basis, but that Mr. Shelton

thought it best that Patricia continue to live with the Sargents.

From July 1968 to February 1970, the Sheltons came to see Patricia only twice, although apparently they did make some telephone calls to ask about her. The situation between these two families became difficult at Christmas 1969, when the Sheltons telephoned that they wanted Patricia home for Christmas. Patricia did not want to go, and the Sargents did not insist. From that time until the commencement of these proceedings the Sheltons telephoned periodically to talk about Patricia coming home. In February 1970, she did stay one night with the Sheltons, but came back to Sargents the next day. Early in April 1970, the Sheltons came to get her at the school she was attending, but Patricia ran out a back door.

During all of this time the Sheltons did not pay the Sargents anything for keeping Patricia. The Sargents did not specifically ask for any money for her keep. Shortly after Patricia began staying with them, Mrs. Sargent contacted Mr. Shelton about some dental needs. Mr Shelton told her he would take the girl to a dentist, but he never did, so the Sargents took care of the matter, and paid for Patricia's dental work. They did notify Mr. Shelton what it cost them, but did not ask him to pay. About this same time Mrs. Sargent also asked Mr. Shelton to pay a book bill at the school which went past due, but when he did not, she paid it.

R. C. 3107.06, insofar as it is applicable to this case provides:

No final decree or interlocutory order of adoption shall be entered by the probate court unless there is filed with the court written consents to the adoption, verified or acknowledged by the following:

(B) By each of the living parents, adult or minor, except as follows:

\* \* \*

(4) If it is alleged in the petition that one or both of the parents have *willfully failed* to properly support and maintain the child for a period of more than two years im-

mediately preceding the filing of the petition. * * * Proof of failure to properly support and maintain the child for a period of more than two years immediately preceding the filing of the petition shall be prima-facie evidence of willful failure properly to support and maintain the child. The consent of a parent found by the court to have willfully failed to properly support and maintain the child for such period shall not be required.

At common law there were no provisions for adopting children. Ohio entered the adoption field by statute in 1859. Over the years there have been numerous changes in the statutory requirements of child adoption. For a history of these changes see *In re Wedl*, 65 Ohio Law Abs. 231, a case decided by this court in 1952. Insofar as the possibility of granting an adoption without the written consent of the living parents of the child, under facts similar to those herein set forth, until 1921 Ohio used language quite similar to that presently extant in most of the other states. These statutes provide generally that the written consent of the parents of a child was a prerequisite to the adoption of that child by another unless, insofar as it applies to the factual situation here, the parents had "abandoned" said child. See 1954 annotation on this subject in 35 A. L. R. 2d 662.

"Abandonment" of a child has been defined as any conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child. 35 A. L. R. 2d 665. *In re Masters*, 165 Ohio St. 503. Were Ohio still an "abandonment" state, obviously there could be no adoption here without the parents' written consent. They have certainly kept in sufficient touch with Patricia to demonstrate positively that neither of them intended to relinquish their parental claims.

Since 1921, however, Ohio has not been an "abandonment" state. In 1945 the essential language of the present statute, quoted *infra*, was enacted, providing that the consent of the natural parents of a child to its adoption by others would be deemed unnecessary if it were found

that such parents "have willfully failed to properly support and maintain the child for a period of more than two years immediately preceding the filing of the petition." Ohio's statute in this respect is apparently unique, no other state having been found which uses similar language.

The Supreme Court considered "willful failure" in 1958 in the case of *In re Biddle*, 168 Ohio St. 209. There the mother and father of the child in question separated at its birth in 1952. In 1953 the mother obtained a divorce and custody. During the separation and following the divorce until May 12, 1956, when the mother left her parents' home both she and the child lived with her parents. Less than a month later, on June 9, these grandparents petitioned for the adoption of the child, alleging willful failure. The evidence indicated that, during this period, although the mother had income she spent little of it on her child, and in general ignored the child most of the time. In sustaining the allegation the Supreme Court pointed out that proper support and maintenance implies also personal care and attention by the parent, and held that "A parent may be found to have 'willfully failed' to support within the meaning of R. C. 3107.06, when such parent knowing of the duty and being able to provide such support voluntarily and intentionally fails to do so."

Three factual facets of the *Biddle* case are significant. First, the petition for adoption was filed less than a month after the mother and the child in question ceased to live in the same home. The two year period of willful failure properly to support and maintain required by the statute thus must have taken place while both the child and the objecting mother were living under the same roof. Secondly, while the mother certainly did not bear her share of the support and maintenance of the child, the testimony did reveal that she did buy some clothing and toys and did pay some medical expenses. Thirdly, while the record showed that she disregarded the child most of the time, gave her very little personal care and attention, leaving the complete daily care of the child to the grandparents, the Supreme Court apparently ignored the fact that she did

give the child *some* attention, and that, since she occupied the same house, she was able regularly to ascertain that her child was actually receiving proper support and maintenance from her own parents.

From these facts and the decision rendered thereon, three pertinent conclusions as to the state of the law may be drawn. First, the "abandonment" principle, so prevalent in most other jurisdictions and originally a part of our statutory law, no longer has any application in Ohio. A parent may be considered to have willfully failed properly to support and maintain his child even though he (or she) has not demonstrated a settled purpose to relinquish all parental claim to the child.

Secondly, the proper support and maintenance of a child required of a parent so that the child's adoption may not proceed without that parent's consent is a personal one. It is not sufficient for a parent to be assured that someone else is properly supporting and maintaining the child. The parent must furnish the proper support and maintenance himself.

Thirdly, the word "properly" cannot be ignored. It is not any support and maintenance that is required: it is "proper" support and maintenance, "proper" being that which is appropriate to all of the circumstances of the child's life situation. "Proper support" has been defined in another context as comprehending the means to live in the style and condition and with a degree of comfort suitable to the person's station in life. *Frye* v. *Burk*, 57 Ohio App. 99.

While *In re Biddle, supra,* was a four-to-three decision, the Supreme Court has subsequently on two additional occasions affirmed its holding there. *Johnson* v. *Varney*, 2 Ohio St. 2d 161; *In re Lewis*, 8 Ohio St. 2d 25. Those later two cases were five-to-two decisions. Chief Justice Taft for the majority in *In re Lewis* analyzed the holdings of *Biddle* and *Johnson* and emphasized that: "It is apparent that, in order to properly support and maintain her child within the meaning of R. C. 3107.06, a mother has the duty to give personal care and attention to that child

and, if able to do so, to provide financial support for the child, even though the child is being properly supported and maintained by someone else and whether such mother has a legal custody and actual possession of the child, either such custody or such possession, or neither such custody nor possession."

Justice Taft also pointed out that since the decision in *Biddle*, the amendment of 1963 which added a sentence next to the last sentence of R. C. 3107.06 (B) (4), indicated a legislative intention to approve the holding of the majority in that case. 130 Ohio Laws 679. This additional sentence provides that "Proof of failure to properly support and maintain the child for a period of more than two years immediately preceding the filing of the petition shall be prima-facie evidence of willful failure properly to support and maintain the child." The effect of this amendment is to place upon the objecting parents the burden of proceeding where the testimony of the petitioners shows a simple failure on the part of the parents to properly support and maintain the child. While the ultimate burden of proof to show willful failure properly to support and maintain by a preponderance of the evidence is not thereby shifted from the petitioners to the parents, the parents do at this point at least have the burden of rebuting the statutory implication of willfulness by some substantial evidence.

In the case at bar, at the close of petitioners' testimony, in the absence of any further testimony, aided by the 1963 amendment, this court would have found a factual posture sufficient to obviate the necessity for the parents' consents to this adoption. In his testimony Mr. Shelton did not deny that he had never given the Sargents anything for Patricia's support and maintenance. He did testify that he was having financial difficulties, that he was periodically out of work, and that in May 1968, he took bankruptcy. At no place in his testimony did he state that he was financially unable to do something for Patricia, or present any figures to show an inability to care for her. It appears that somehow he was taking care of the other member of his family.

Although he was out of work when Patricia began to live with the Sargents, he did go back to work on April 19, 1968. Even so, he did not offer anything to the Sargents on Patricia's behalf, or even pay a $2.00 book bill for which specific request was made of him. That he was having difficulties in making ends meet is clear: that he was unable to do anything for Patricia is not clear. Mr. Shelton attempted to excuse his failure by suggesting that, Mrs. Sargent not being in good health, Patricia was paying her own way by the things she was doing around the Sargent household. While Mrs. Sargent did have periods of disability, these were not extensive. Patricia herself testified to the effect that the various things she did around the Sargent home to assist in the chores resulted from her desire to be helpful as a member of the household rather than because of any requirement.

*In re Wright,* 15 Ohio Misc. 354, cited on the parents' behalf, states that "it seems unfair for a person to take a child into their home and maintain absolute silence as to their expectations of maintenance, even though it is offered, and after lulling a parent into a feeling of relief from a responsibility, use the failure to support as a device to deprive the parent of his right as a parent." There the child was residing with its maternal grandparents. Prior to its mother's death its father paid regular support. While he quit paying thereafter he did tell the grandparents to let him know if they needed anything. He kept regular touch with the child and bought him presents. The grandparents had adequate income and made no requests for support. Here the Sargents were not relatives and, while they did not request any support as such, they did ask the parents to pay a book bill and to provide dental care, without results.

Accordingly this court finds by a preponderance of the evidence that the parents of the child herein sought to be adopted have willfully failed to properly support and maintain her.

Under the statute, such willful failure must exist for a period of more than two years immediately preceeding

the filing of the petition. The petition in this case was filed on April 16, 1970. Patricia began living with the Sargents on March 6, 1968. Thus, the maximum amount of time involved in the Sheltons' willful failure is just one and a half months over two years. This time factor has given this court more difficulty than the willful failure aspect.

First, when Patricia came to live with the Sargents on March 6, 1968, it was with the agreement of all concerned that she would remain there until school was out for that year. This time period was later extended to enable her to take the Florida vacation, from which she returned in July 1968. Does the existence of this agreement prevent the statute from beginning to run? I think not. Nothing in the agreement referred to support and maintenance. Unless it can be implied that the Sheltons were relying upon a continuation of the past favors conferred upon them by the Sargents, there being no direct testimony to this effect, it cannot be said that they were lulled into a relief from responsibility which would make their failure to support and maintain unintentional. Considering that the Sargents did request assistance for dental services and a book bill, it would be difficult to make that implication.

Secondly, the evidence indicates that Mr. Shelton was out of work from November 6, 1967 to April 19, 1968, and that he had financial difficulties for a much longer period. If, from this fact, it is concluded that he was unable to make any contributions to Patricia's support and maintenance, the prima facie case of willfulness made by petitioners testimony would have been negated at least up to April 19, 1968, which is some two days less than two years immediately preceding the filing of the petition. The Sheltons, however, did not go into any monetary detail as to the extent of their financial embarrassment. Considering that apparently they were able to support their other six children during this period, this court does not find any substantial evidence from this fact to rebut petitioners' prima facie case.

Thirdly, on December 23, 1969, Mr. Shelton called about Patricia coming home. While it is not clear whether

this call was for a Christmas visit or for good, it does appear that thereafter Patricia received telephone calls about her coming home to stay, although the Sheltons did nothing positive about the matter until shortly before the petition herein was filed when they tried to get Patricia from her school. This court is unwilling to conclude that such evidence tolls the statute in favor of the Sheltons.

The court therefore concludes that Mr. and Mrs. Shelton have willfully failed to properly support and maintain their daughter, Patricia, for a period of more than two years immediately preceding the filing of the petition for her adoption by the Sargents, and accordingly it will be ordered that this adoption may proceed apace, in accordance with Chapter 3107. of the Revised Code, without any written consents from the parents of the child sought to be adopted.

This has been a most difficult case to decide. Any testimony or implications in the record relative to what is for the best interests of the child in question has been ignored, such not being considered pertinent to this inquiry. The facts herein have been applied clinically, without reference to persons or personalities. The divided court holding in the *Biddle* case, as supported by the divided court decisions in the *Johnson* and *Lewis* cases seems to require that approach.