Carthal Deane HARPER and Loraine
HARPER *v.* James Dennis CASKIN

78-301                                    580 S.W. 2d 176

Opinion delivered April 23, 1979
(In Banc)

*Henry & Graddy,* for appellants.

No brief for appellee.

CONLEY BYRD, Justice. Appellants, Carthal Deane Harper and Loraine Harper, the stepfather and mother of James Dennis Caskin, Jr., a minor, sought to adopt James Dennis Caskin, Jr. without the consent of the minor's father, appellee James Dennis Caskin. In doing so appellants relied upon Ark. Stat. Ann. § 56-207(a)(2) (Supp. 1977), which provides:

"Consent to adoption is not required of a parent of a child in the custody of another, if the parent for a period

of at least one [1] year has failed significantly without justifiable cause (i) to communicate with the child or (ii) to provide for the care and support of the child as required by law or judicial decree, . . ."

The trial court denied appellants' petition finding that "it has not been shown that the Respondent . . . failed for a period of (1) year, significantly without justifiable cause to communicate with and/or provide care and support for James Dennis Caskin, Jr."

The record shows that appellee and appellant, Loraine Harper, were formerly husband and wife. James Dennis Caskin, Jr. was born to that marriage. Appellee and Loraine were divorced in July, 1973, and Loraine was awarded custody of James Dennis Caskin, Jr. Loraine married appellant Carthal Deane Harper in December, 1973. A prior petition for adoption was dropped in 1975.

Carthal Deane Harper testified that he had not communicated with appellee in the past two years. He did not remember receiving any support from appellee since January of 1977. He did not know of any communications his wife may have had with appellee.

Loraine Harper, the natural mother, testified that she did not recall communicating with appellee between Christmas of 1976 and the filing of the petition in March, 1978. The last child support she received from appellee was $100 in January, 1977. She remembered calling appellee once in North Carolina, but she did not remember the date. Appellee had visited with the child three or four times since April of 1978. She is presently under court orders to let appellee visit with the child.

Carolyn Caskin, the wife of appellee, testified that Mrs. Harper called her landlord in North Carolina in June of 1977 but that Mrs. Harper refused to talk to her when she called Mrs. Harper back. The Caskins sent $50 in July, 1977, when appellee was in the hospital. Appellee, while in the Armed Services, developed epileptic seizures in October, 1976, and was in and out of the hospital during 1977. Appellee was severed from the Marines in October, 1977, with a lump sum

payment of $19,000. Appellee is now an out patient at the V.A. Hospital in Little Rock. Mrs. Caskin says that she and appellee had visitation problems with Mrs. Harper. They did not contact her about visitation upon returning to Little Rock in November, 1977, because they thought it would do no good. When they did visit, Mrs. Harper required that the visiting be done in Mr. Harper's home. Appellee is still having seizures and has been unable to obtain employment since his discharge.

Appellee testified that he made his child support payments in 1975 and 1976. He last visited the child Thanksgiving, 1975. Mrs. Harper has prevented him from seeing the child since that time. Mrs. Harper called him in June, 1977, and told him that she needed $300 because the child was sick. At the time he was in the hospital receiving only one-half pay; he sent $50 in July, 1977. He could only communicate with his child through Mrs. Harper. He did not ask to speak to the child because he thought it would do no good. He had had three seizures since returning to Little Rock in November 1977, and has been an out patient from the V.A. Hospital since returning to Little Rock. He is not presently working and has no income. He has visited the child four times since April, 1978. He says the child is entitled to V.A. benefits, but Mrs. Harper told him she was not interested in V.A. benefits.

On rebuttal Mrs. Harper said she had been reluctant to let the child visit with appellee over night because he was not properly cared for on one occasion when he was sick.

In arguing that the trial court erred, appellants accentuate the small amount of child support paid during the 12 months preceding the filing of the petition and the lack of communication and argue that under the statute, *supra*, they are entitled to adopt without the parent's consent when the parent has "substantially" failed in his legal duty to be a parent for a period in excess of one year. In making their contentions, appellants overlook the provision of the statute which requires that the parent's failure to support and communicate be *"without justifiable cause. . . ."* They also overlook the heavy burden of proof placed upon one wishing to adopt a child without the consent of the parent, *i.e.*, by clear and con-

vincing evidence. See *In re Cozza,* 163 Cal. 514, 126 P. 161 (1912) and *In Re Adoption of Porras,* 13 App. Div. 2d 239, 215 N.Y.S. 2d 778 (1961).

With respect to the burden cast upon one wishing to adopt a child against the consent of a parent, 2 Am. Jur. 2d *Adoption* § 60 states:

> "The judge before whom an application or petition for adoption is brought must determine from extrinsic evidence whether, under the circumstances of the case, the consent of the natural parent of the child is necessary to adoption, and if required whether that consent has been given. In order to grant an order or decree of adoption in opposition to the wishes and against the consent of the natural parent, the conditions prescribed by statute which make that consent unnecessary must be clearly proven and the statute construed in support of the right of the natural parent. Natural rights of parents should not be passed over lightly, even though the court is given power to enter decree of adoption without the consent of the parent or guardian when the judge considers that the best interests of the child will be promoted. The law is solicitous toward maintaining the integrity of the natural relation of parent and child, and where the absolute severance of the relation is sought without the consent and against the protest of the parent, the inclination of the courts is in favor of maintaining the natural relation.
> Where the controversy is whether the parent has abandoned the child so as to dispense with the necessity of his consent, the burden of proof is on the petitioner to justify the adoption on that ground, and it is often said that the evidence to show abandonment must be clear and convincing. . . ."

In 2 C.J.S. Adoption of Persons § 96 under the title "Weight and Sufficiency of Evidence" the matter is stated:

> "In an adoption proceeding contested by a natural parent the facts justifying the adoption must be established by clear and convincing evidence."

In *People ex rel. Buell* v. *Bell,* 20 Ill. App. 2d 82, 155 N.E. 2d 104, the burden is stated:

> ". . . Adoption, which affects the course of inheritance, deprives the child of the place in which it was placed by nature, and by force of law thrusts the child into another relationship, while severing conclusively the rights and interests of the natural parents, is a very different, and more drastic matter than a change of custody; the rights of natural parents to their children must not be terminated unless a clear and convincing case is made in strict compliance with the adoption statute. . . . "

In *Re Cozza,* 163 Cal. 514, 126 P. 161 (1912), the burden on one wishing to adopt a child without the consent of a parent is stated:

> "The power of the court in adoption proceedings to deprive a parent of his child being in derogation of his natural right to it, and being a special power conferred by the statute, such statute must be strictly construed, and in order to warrant the exercise of the special power and sustain an order for adoption made in opposition to the wishes and against the consent of the natural parent on the ground that conditions prescribed by statute exist which make that consent unnecessary, the existence of such conditions must be clearly proven, and the evidence bring them within the terms and intent of the statute. The law is solicitous toward maintaining the integrity of the natural relation of parent and child, and in adversary proceedings in adoption, where the absolute severance of that relation is sought, without the consent and against the protest of the parent, the inclination of the courts, as the law contemplates it should be, is in favor of maintaining the natural relation. . . ."

When we consider that the failure of the parent must be *without justifiable cause,* we cannot say that the trial court erred in holding that appellants had not sustained the heavy burden of proof placed upon them.

Affirmed.

HARRIS, C.J. and FOGLEMAN, J., concur.

JOHN A. FOGLEMAN, Justice. I concur in the affirmance of the judgment denying the petition for adoption, because I, cannot say that the finding that it had not been shown that the natural father's failure to communicate or to provide care and support for the child was without justifiable cause is clearly against the preponderance of the evidence. I feel that the portion of the opinion relating to the quantum of proof required is not only unnecessary to the decision, it is also an issue raised by the court and decided without the benefit of adversary advocacy.

Ordinarily, when there is a division of authority and the majority of the court elects to follow a majority rule or the weight of authority, I feel that I should accept that position. In this case, I cannot accept the requirement that there must be clear and convincing evidence to show that the consent of a parent to an adoption may be dispensed with in considering a petition for the adoption of his child, although I can readily accept that rule as applicable where the consent is rendered unnecessary because there has been an abandonment. The very word "abandonment" requires such a construction. It has been defined to mean:

> "To relinquish or give up with the intent of never again resuming or claiming one's rights or interests in; to give up absolutely; to forsake entirely; to renounce utterly; to relinquish all connection with or concern in; to desert, as a person to whom one is bound by a special relation of allegiance or fidelity; to quit; to forsake."

See, *Walthall* v. *Hime,* 236 Ark. 689, 368 S.W. 2d 77 (1963); *Woodson* v. *Lee,* 221 Ark. 517, 254 S.W. 2d 326. See also, *Hyde, Ex'rs.* v. *Hyde,* 240 Ark. 463, 400 S.W. 2d 288. Both *Walthall* and *Woodson* were adoption cases, based upon our adoption statute then in force. See Ark. Stat. Ann. § 56-106 (Repl. 1971). We have never quite reached the point of requiring proof of abandonment by a parent by clear and convincing evidence. In *Woodson,* we quoted from a California case

[*In re Cordy*,[1] 169 Cal. 150, 146 P. 532 (1940)], which also involved an abandonment statute similar to our statute then in effect. The effect of the holding by the California court was that every *intendment* should be in favor of the non-consenting parent in an adversary proceeding where absolute severance of the natural relation of parent and child is sought without the consent, and over the protest, of the parent, because the inclination of the courts is in favor of maintaining the natural relation. In treating "intendments" in pleadings, it has been said:

> \*\*\* The meaning of intendment is that, allowing an averment to be true, but at the same time a case may be supposed consistent with it which would render the averment inoperative as a full defense, such case shall be presumed, unless specifically excluded by particular averments. \*\*\*

*Detroit, L. & N. R. Co.* v. *McCammon,* 108 Mich. 368, 66 N.W. 471 (1896).

Intendment has also been given definitions such as: inclination, disposition, meaning, signification, intention, design, purpose, significance; the true or correct meaning of something. Webster's New International Dictionary, 2d Edition; Webster's Third New International Dictionary; The Random House Dictionary of the English Language. Intendment of law has been defined as: the true meaning, the correct understanding, or intention of the law; a presumption or inference made by the courts. Bouvier's Law Dictionary (Rawle's 3rd Revision). Thus, the effect of *Woodson* would be no greater than the creation of a presumption favoring the parent or the requirement that all inferences deducible from the evidence be drawn favorably to the parent. This would do no more than require that the petitioner for adoption assume the burden of proof and that the court draw inferences favorable to the parent, much as the Workmen's Compensation Commission does in favor of a claimant.

---

[1]The rule of strict construction of the California adoption statute stated in *Cordy* was disapproved because it was inconsistent with the rationale of other decisions and because the court had declared that the purpose of later statutes was the promotion of the welfare of children, bereft of the home and care of their real parents. *In re Barnett's Adoption,* 54 Cal. 2d 370, 354 P. 218, 6 Cal. Rptr. 562 (1960).

On the other hand, we have recognized that it is widely held that clear, unequivocal and decisive evidence is required to establish abandonment of property. *Hendrix v. Hendrix*, 256 Ark. 289, 506 S.W. 2d 848.[2] So, insofar as our statute still requires abandonment, I could readily accept the requirement of clear and convincing evidence under our previous statute, and on an allegation of abandonment under the present one, even though neither case cited by the majority really supports its position. The court neither said nor held that a petitioner for adoption must show that a parent's consent is not necessary by clear and convincing evidence in *In re Adoption of Porras*, 13 A.D. 2d 239, 215 N.Y.S. 2d 778 (1961). All the court said was that the burden placed upon the petitioner to establish abandonment by the natural parent was a heavy one. *In re Cozza*, 163 Cal. 514, 126 P. 161 (1912), from which the majority quotes, is a case in which, unlike this one, abandonment was the principal ground relied upon for avoiding the necessity of parental consent. The California court said that it would be a waste of time to point out that the evidence did not show desertion and that it was so clearly shown that there was no abandonment that the matter ought not to be open for discussion. Thus, the portion of that opinion quoted by the majority, if not dictum, affords poor support for requiring that significant failure to communicate be shown by clear and convincing evidence.

A drastic change was made when the Revised Uniform Adoption Act [Ark. Stat. Ann. §§ 56-201 — 56-221 (Supp. 1977)] went into effect on July 5, 1977. See § 22, Act 135 of 1977. In the new act, the General Assembly added a ground for dispensing with the requirement of consent, although the provision as to abandonment was retained. This proceeding, however, does not involve Ark. Stat. Ann. § 56-207(a)(1), under which consent of a parent who has abandoned a child is not required. A much less stringent standard for dispensing with consent was added to our adoption law by Ark. Stat. Ann. § 56-207(a)(2). Under that subsection, consent of a parent of a child in the custody of another is not required if the parent, for a period of at least one year, has failed

---

[2] It should be noted, however, that in *Hendrix*, we merely held that we could not say that the chancellor's holding that there had been no abandonment of the real property involved was clearly against the preponderance of the evidence.

significantly without justifiable cause, either to communicate with the child or to provide for its care and support as required by law or judicial decree. It seems to me that the addition of this ground was a recognition of the fact that, while parental rights are important, they are not more important, or to be given more emphasis, than the rights of children.

The Commissioners' note to the applicable section of the Revised Uniform Adoption Act certainly suggests that there was an intention to impose a less stringent standard than would be required to show abandonment. It is recognized in other jurisdictions that non-support and desertion are less drastic breaches of parental obligations than abandonment. *Stalder* v. *Stone,* 412 Ill. 488, 107 N.E. 2d 696, 35 ALR 2d 653 (1952); *Smith* v. *Smith,*[3] 67 Idaho 349, 180 P. 2d 853 (1947); *Lout* v. *Whitehead,* 415 S.W. 2d 403 (1967). Under statutes similar to Ark. Stat. Ann. § 56-207 (a) (2) relating to the parent's failure to support the child, there is quite respectable authority that the burden of the petitioner is met by proof by a preponderance of the evidence. *Khafaji* v. *Meitzen,* 429 S.W. 2d 174 (Tex. Civ. App., 1968); *Jordan* v. *Hancock,* 508 S.W. 2d 878 (Tex. Civ. App., 1974); *In re Adoption of Wright,* 15 Ohio Misc. 354, 240 N.E. 2d 923 (1968).

Requiring a greater quantum of proof than a preponderance of the evidence for showing that a parent has failed *significantly* and *without justifiable cause* to either communicate with his child or to provide for its care and support as a substitute for that parent's consent does emphasize parental rights and deemphasize the child's rights. The parent-child relationship involves reciprocal rights and obligations. They are not reciprocal when the rights of a parent are elevated above both his own obligations and his child's rights.

Many other jurisdictions hold that the rights of the parent must yield to the rights and interests of others in view of the requirement that the welfare and best interests of the minor should at all times be controlling in adoption proceedings. *Hamilton* v. *Rose,* 99 So. 2d 234 (Fla. 1957); *Stearns* v. *Allen,* 183 Mass. 404, 67 N.E. 349 (1903). It

---

[3] In *Smith,* it was pointed out that an adjudication of abandonment cannot be based upon non-support. And, similarly, neglect is somewhat short of wilful neglect. *In re E.C.N.,* 517 S.W. 2d 709 (Mo. App., 1974).

is widely held that the welfare and best interests of the minor child are the dominant, primary and paramount consideration and the rights and wishes and feeling of the natural parents and the petitioners for adoption are secondary, subordinate and subservient thereto. *In re Adoption of Morrison,* 260 Wisc. 50, 49 N.W. 2d 759 (1951); *In re Neusche,* 398 S.W. 2d 453 (Mo. App., 1965); *Palmisano* v. *Baltimore County Welfare Board,* 249 Md. 94, 238 A. 2d 251 (1968); *Rhodes* v. *Shirley,* 234 Ind. 587, 129 N.E. 2d 60 (1955); *Galloway* v. *Galloway,* 249 S.C. 157, 153 S.E. 2d 326 (1967). In elaborating upon the duty of the courts, even appellate courts, to protect the rights of minor children, the South Carolina Court said:

> It has been broadly stated that under adoption proceedings there are four interested parties: (1) The minor child; (2) the parents or those standing in place of the parents; (3) the party seeking to adopt; and (4) the state. Undoubtedly, the person standing highest in interest is the child, and when adopted its status for life is entirely changed.

The Massachusetts Supreme Court has said that the interest of natural parents, important as it is, must yield when it is in conflict with the best interest of the child. *In re Adoption of a Minor,* 343 Mass. 292, 178 N.E. 2d 264 (1961).

When the new statute provided a more liberal basis for dispensing with parental consent, the majority rule, the weight of authority and our previous holdings on the question of abandonment became much less significant. We should look to the decisions of those states which have adopted the uniform act.

In North Dakota, a state which has adopted the uniform act, the Supreme Court, speaking of parental rights in *Kottsick* v. *Carlson,* 241 N.W. 2d 842 (N.D., 1976)), stated:

> *** The relationship of parent and child consisting of a bundle of essential human rights necessary for the preservation of society must be carefully balanced and jealously guarded.

The Supreme Court of Montana (where the original uniform act was substantially adopted) considered parental

obligations in *Conley* v. *Walden*, 166 Mont. 369, 533 P. 2d 955 (1975) and reached the following conclusion:

> The general obligations of parenthood include these minimum standards: 1) Express love and affection for the child. 2) Express personal concern over the health, education and general welfare of the child. 3) The duty to supply the necessary food, clothing and medical care. 4) The duty to provide an adequate home. 5) A duty to give social and religious guidance. \*\*\*

We have also recognized specific parental duties and obligations which are indicative of a correlative right of the minor child. The parent has a legal and moral duty to support and educate his child and to provide the necessities of life to it and to give it those advantages which are reasonable, considering the parent's financial condition and position in society. *Bostic* v. *Bostic,* 229 Ark. 127, 313 S.W. 2d 553; *Kuespert* v. *Roland,* 222 Ark. 153; 257 S.W. 2d 562; *Brown* v. *Brown,* 233 Ark. 422, 345 S.W. 2d 27; *Central Manufacturers' Mut. Ins. Co.,* v. *Friedman,* 213 Ark. 9; 209 S.W. 2d 102, 1 ALR 2d 557; *McDaniel* v. *Brandon & Baugh,* 168 Ark. 1063, 272 S.W. 670; *Bockman* v. *Bockman,* 202 Ark. 585, 151 S.W. 2d 99; *Alcorn* v. *Alcorn,* 183 Ark. 342, 35 S.W. 2d 1027; *Aaron* v. *Aaron,* 228 Ark. 27, 305 S.W. 2d 550; *Sain* v. *Smith,* 254 Ark. 720, 495 S.W. 2d 865. The courts will zealously enforce these duties. *Jordan* v. *Wright,* 45 Ark. 237; *Waller* v. *Waller,* 220 Ark. 19, 245 S.W. 2d 814. They are derived from principles of natural law and are owed both to the child and to the public. *Jordan* v. *Wright,* supra; *Johnson* v. *Mitchell,* 164 Ark. 1, 260 S.W. 710.

In Oklahoma, where the original uniform act was adopted in 1957, the primary inquiry in adoption is whether it will promote the best interest of the child. *In re Adoption of Greer,* 463 P. 2d 677 (Okla. 1970). In Montana, the best interests of the child are of utmost concern in adoption cases. *In re Adoption of Biery,* 164 Mont. 353, 522 P. 2d 1377 (1974).

It is important that the "best interests of the child" in adoption cases take on a meaning different from that accorded it as a term of art in granting custody in a divorce action. In an adoption proceeding under the uniform act, the term includes among other things, the "total relationship between

child and parent pertaining to, and involving heterogeneous values, rights, duties and concepts." *Kottsick* v. *Carlson,* 241 N.W. 2d 842 (N.D. 1976). The North Dakota court indicated that the grounds for termination of parental rights "must rest upon the attitude, conduct, ability and such other matters relating to the parents' duties, responsibilities and care for the child which may be, and frequently are, collectively referred to as 'fitness.' " The best interest of the child does not require that it be placed in the wealthiest home, but it should be in the home which, all things considered, is available and will promote the welfare of the particular child. *In re Neusche,* 398 S.W. 2d 453 (Mo. App. 1965). The matter has been put in appropriate perspective in Florida, where in *Jones* v. *Allen,* 277 So. 2d 599 (Fla. App., 1973), the court said:

> We hasten to add, however, that the mere fact that strangers might make better parents or that they might be in a better financial position than the natural parents is not in and of itself sufficient even where it is manifestly clear that the child might be better off in the proposed new environment. Were these the only tests to be employed it would be quite possible for absolute strangers to arbitrarily choose any child of any parents poorer and/or less moral than themselves and, simply by following the procedures in the adoption statute, walk away with the child.

> Of course, circuit judges are not likely to let this happen absent an additional showing that the natural parents have failed to carry out their parental duties to the child in some substantial way and have neglected or shown disinterest in the welfare of the child. This is plainly as it should be as we perceive the law.

If the parents' duties and obligations are so important and so zealously guarded by the courts, why should it be necessary to require that default by having "failed substantially" be proved by more than a preponderance of the evidence? On appeal, determination of the trial court in an adoption proceeding as to what is in the best interest of the child will stand where there has been no abuse of discretion. *In re Neusche,* supra. In Arkansas, in probate court procedures, the scope of review and all other matters relating to appellate

review are controlled by the law and rules applicable to appeals in equity cases. Ark. Stat. Ann. § 62-2016 (g). A Missouri court has spoken on the significance of such a requirement in an adoption case, *In re E.C.N.*, 517 S.W. 2d 709, viz:

> In this case it is our duty to review the record, as in actions of equitable nature, upon the law and the evidence, and reach our own conclusions, giving due deference to the trial court on questions of credibility. Unless the judgment is clearly erroneous and in conflict with the clear preponderance of the evidence, it should not be lightly disturbed.

Even in Oklahoma, where the statute requires a *wilful* failure or refusal to support, the supreme court has held that it will not reverse the findings of the trial court applying the rule of preponderance of the evidence, unless they appear, after examination of the record to be clearly against the weight of the evidence. *DeGolyer* v. *Chesney*, 527 P. 2d 844 (Okla. 1974); *Wade* v. *Mantooth*, 417 P. 2d 313 (Okla. 1966); *Davis* v. *Neely*, 387 P. 2d 494 (Okla. 1963), cert. den. 379 U.S. 2, 85 S. Ct. 31, 13 L. Ed. 2d 21 (1964).

I find no sound basis for a "clear and convincing" evidence rule and no reason why the typical de novo review in equity cases is not adequate for protection of the rights of both parent and child.

I am authorized to state that the Chief Justice joins in this opinion.