No 12791

IN THE SUPREME COURT OF THE STATE OF MONTANA

1975

---

IN THE MATTER OF THE APPLICATION OF MELVIN CONLEY and
RUBY F PERSHALL, Petitioners, for a Writ of Habeas Corpus
to Inquire into the Cause of Detention of CHRISTINA MAE
CONLEY (INNIS), EDGAR MELVIN CONLEY (INNIS) and DALE
WAYNE CONLEY (INNIS), Petitioners,

                      -vs-

LOIS INNIS WALDEN,

                              Defendant.

---

Appeal from: District Court of the Sixth Judicial District,
             Honorable Jack D Shanstrom, Judge Presiding.

Counsel of Record:

    For Appellant:

        Kent R Douglass, Livingston, Montana.
        Harrison, Loendorf and Poston, Helena, Montana.
        James T Harrison, Jr argued, Helena, Montana.

    For Respondent:

        Joseph T Swindlehurst argued, Livingston, Montana.

---

                    Submitted:  March 6, 1975

                    Decided:  APR - 7 1975

Filed:  APR - 7 1975

Thomas J. Kearney
                              Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

This is an appeal from an order of the district court, Park County, denying a petition for the possession and custody of three minor children in a habeas corpus proceeding.

Petitioners Melvin Conley and Ruby F. Pershall are the natural parents of Christina Mae, born July 3, 1960; Edgar Melvin, born January 15, 1965; and Dale Wayne, born October 8, 1962. Respondent is Lois Innis Walden the maternal stepgrandmother of the children and the widow of Jesse Innis, father of Ruby F. Pershall, petitioner herein.

Petitioners testified they are members of a religious group headed by Alfred F. Pershall, the present husband of petitioner Ruby. The question of the antiquity of the religion was raised at the hearing and petitioner Melvin Conley testified his grandfather had "started all things in common way back". The group now makes its headquarters in a trailer court in Yuma, Arizona, and the male members are in the masonry business together.

Respondent Lois Innis Walden is the sister of Alfred, Robert and Charley Pershall and the aunt of petitioner Melvin.

From petitioners' testimony it appears that all the male members of the group have exchanged wives during the last eight years. At the time of the hearing the family groupings were:

a) Alfred F. Pershall is married to petitioner Ruby, ex-wife of petitioner Melvin Conley.

b) Charles Pershall is married to Donna, Alfred's ex-wife.

c) Robert Pershall is married to Catherine, Charley's ex-wife.

d) Petitioner Melvin Conley is married to John Powell's (another group member) ex-wife Jessie. This marriage is the most recent within the group and took place in August 1972.

Sometime prior to 1966 petitioner Ruby, while still married to Melvin, began living with Alfred Pershall and became pregnant by him. Melvin testified: That he and Ruby were not getting along and he discussed the situation with his Uncle Alfred and as a result Ruby went to live with Alfred. That he, Melvin, obtained a divorce from Ruby on the grounds of incompatibility, not adultery, and he was given custody of their three children. Melvin then left California, where he had obtained the divorce, and went to Plattsburg, Missouri where his Uncle Robert lived. There he lived with Catherine Pershall, Charley's ex-wife and Robert's present wife. He took the family to Kansas City where they moved in with in-laws.

About this time, June 1967, respondent and her then husband Jesse Innis became concerned about the children's welfare and reported the situation to the Missouri welfare department, of Clinton County. That office had the children picked up in Kansas City and delivered into the custody of their grandparents, Jesse and Lois Innis.

On June 6, 1967, the circuit court of Clinton County, Missouri, issued an order granting temporary custody of the children to the county welfare department and that department placed the children in the care and custody of respondent and her husband, Jesse Innis. Petitioner Melvin Conley had notice of the hearing held by the court before it granted custody of the children to the welfare department of Clinton County and was actually present, though later in 1972, he told another judge in Missouri that he did not have notice, nor was he present.

On or about that same time petitioner Melvin moved into the Innis home and lived there for about a year. He paid $30 a week for support of the children until February or March 1968. The Innis' purchased a truck from Melvin with the understanding that the support payments would go to the payments on the truck. Petitioner Melvin did some work about the Innis farm and in the house.

In June 1968, petitioner Melvin moved to Kansas City leaving the children at the Innis'. A month later he left Kansas City, removed

the truck from the Innis garage during the night, and departed for destinations unknown. From that date, until the middle of 1973, he made no attempt to support the children or visit them, or to advise the Innis' of his whereabouts.

From the fall of 1967, petitioner Ruby Pershall, the children's "devoted mother" knew her children were wards of the Missouri court and were living and being cared for by her father and stepmother. From that time to the time of the habeas corpus hearing, she knew where her children were but made no serious attempt to contact, correspond with, telephone, visit, nor support her three children. She testified that letters she sent were returned but respondent denied such letters were received and that that she had nothing to do with returning them, if sent. Testimony given at the hearing indicated that petitioner's father, Jesse Innis, did not approve of the religious group and the alleged fact that fornication and adultery were practiced by the group.

Testimony given by Christina, the oldest child, indicated the group practiced cruel and unusual punishments upon the children when they were of tender years. She testified she was put in a gunny sack, by either Catherine or Donna, and swung around; that the children were put into garbage pits at night and told there were snakes in it. Other punishments consisted of putting a child's head under water for what seemed a long period; Christina testified that her mother, petitioner Ruby, did this.

Robert
Alfred Pershall testified: That the name of the religious group was "The Church of the First Born" and it originated in Amsterdam, Idaho, where the elder brothern lived. That he went down to Yuma to see what kind of a minister his uncle Alfred was and to find out more or less what was going on, at the urging of his mother and because of the "yapping" of his wife Catherine. That he went to find out if the charges of child abuse, fornication and adultery were true and being practiced by men claiming to be ministers of the gospel.

That he moved into the group's trailer court and lived there for about six months.

On direct examination he testified he found no child abuse, fornication nor adultery among the members of the religious group living at the trailer court, yet on cross-examination he admitted filing charges against his brothers on those various charges. He wrote to a brother in Oregon that it was interesting to get up early in the morning "to see which chicken came out of which hen house". He further testified that those charges were dropped because he did not actually see anything to substantiate the charges.

In November 1971 Jesse Innis, the children's natural grandfather, died in Missouri. Some six months later respondent, the widow of Jesse Innis, moved to Wilsall, Montana, where she now resides. Since coming to Montana, she has remarried to one Arthur Walden.

Before moving to Montana respondent received an order dated March 20, 1972, from the circuit court of Clinton County, juvenile division, giving her custody and granting her permission to remove the children from Missouri to Montana. On May 15, 1972, that same court entered its order granting respondent permission to institute adoption proceedings in Montana for the three minor children. A petition for adoption was filed by respondent in Park County, Montana, June 6, 1972, and a decree of adoption was issued on June 27, 1972. The Park County district court found that petitioners' consent for the adoption was not necessary since the children were declared dependent and neglected children by the state of Missouri and that Missouri had granted care, custody and control to respondent.

Three months later, on September 25, 1972, the circuit court of Clinton County, Missouri, juvenile division, entered an order setting aside as void, ab initio, all previous orders entered by it concerning the children for the reason that notice had not been given the parents, petitioners here. While respondent was notified of the hearing on the petition to set aside the Missouri court's orders, she

did not have funds to retain Missouri counsel and she failed to appear pro se due to a failure to give her notice of a postponed hearing date.

In its conclusions of law the trial court here found that it was not bound by the action of the Missouri court; that the Montana court had full jurisdiction over the adoption and was entitled to rely on the consent of the Missouri court, the proper authority to grant consent at the time; that the court was not compelled to honor the later order retracting the consent; and, further, that the later Missouri proceedings were uncontested and based upon the false allegations of petitioner Melvin Conley that he did not have notice, when in fact he was before the court when custody was lodged with the Innis'. The court went further in its conclusions and found abandonment by reason of petitioners' failure to do anything for the children for over five years.

Appellant petitioners state the issues to be:

1) Whether they were ever "judicially deprived of the custody" within the meaning of section 61-205(c), R.C.M. 1947?

2) If not, were they entitled to notice of the adoption?

Respondent argues that this is a habeas corpus proceeding and appellants are attempting to use habeas corpus to collaterally attack the adoption decree. We agree and will treat the matter as it was brought by appellants, as one of habeas corpus seeking the custody of the children.

Habeas corpus being equitable in nature the paramount consideration is the welfare of the children. In an Oklahoma child custody case, Mathews v. Grant, (Okla. 1958), 326 P.2d 1043, the court held that it was not bound to deliver the custody of a child to a particular claimant but must leave it in such custody as the welfare of the child appears to require at the time.

Here, the trial court found the natural parents unfit to have custody of the children and that their welfare and best interests would be best served by leaving them with respondent. Such finding is convincingly established by the record and we note with interest that on appeal petitioners do not allege that the welfare of the children would best be served by the transfer of custody to them.

The welfare of the children is the rule in Montana recently stated in Riley v. Byrne, 145 Mont. 138, 145, 399 P.2d 980, a case where the Court considered the welfare of children in refusing to set aside a decree of adoption brought on the basis that the parents' consent was obtained by fraud. There the Court said "* * * that the adoption was for the welfare and best interests of the two minor children."

Whether the action is treated as habeas corpus or a petition to set aside an adoption, the welfare of the child is the paramount factor. In a recent case before the Supreme Court of Oklahoma, In re Adoption of Graves, (Okla. 1971), 481 P.2d 136, 138, the Court said the "welfare of the child is not to be ignored in considering the validity of the adoption proceedings."

In an Arizona case, In re Adoption of Hammer, 15 Ariz.App. 196, 487 P.2d, 417, 419, it was said:

> "* * * Moreover, from a strictly humanitarian standpoint, there must be an end to the emotional stress and strain that is involved in the natural parents' attempt to gain custody of their child. This strain is particularly acute to the adoptive child itself, who may have established strong bonds of affection and love for the adoptive parents, and to the adoptive parents who must suffer the spectre of losing their child. Also, sound reasons of public policy demand that orders of adoption have finality so as to encourage adoption of children who might otherwise be homeless.
>
> " * * *
>
> "However, once a judicial determination is made giving rise to a final order of adoption, and that new relationship is allowed to mature, then the courts of this state should only nullify that new relationship for the most cogent reasons."

Considering the record in the instant case, there are numerous grounds upon which the adoption itself could have been sustained without the consent of petitioners. A period of six years of absolute abandonment of the three children with no support, no contact, and no visits by either parent is the most basic ground. While petitioners argue that the district court made no specific finding of abandonment and nonsupport at the time of the adoption, the matter is one in equity and no specific finding of fact and conclusion of law are required--just a decree.

The general obligations of parenthood include these minimum standards: 1) Express love and affection for the child. 2) Express personal concern over the health, education and general welfare of the child. 3) The duty to supply the necessary food, clothing and medical care. 4) The duty to provide an adequate home. 5) A duty to give social and religious guidance. Here, petitioners fall far short of these minimum standards. See: Ottley v. Hill, 21 Utah 2d 396, 446 P.2d 301; Van Orman v. Van Orman, 30 Colo.App. 177, 492 P.2d 81; Neasham v. McNair, 103 Iowa 695, 72 N.W. 773; 59 Am Jur 2d, Parent and Child, §§ 50-60; 47 A.L.R. 110.

The Supreme Court of Idaho in Finn v. Rees, 65 Idaho 181, 141 P.2d 976, 980, a case very similar in facts, in a habeas corpus petition noted there was ample evidence of abandonment to support the trial court's findings and refused to vacate a decree of adoption merely because the trial court had premised its adoption upon the consent of the great grandparents. Of particular import is the Court's holding, citing an Oregon case, that:

> "'* * * Proceedings in habeas corpus are in the nature of a collateral attack, and consequently errors or irregularities which might render a judgment voidable cannot be reached by habeas corpus.'"

See also: Conville v. Bakke, (Okla.1964), 400 P.2d 179; In re Hoermann's Estate, 108 Mont. 386, 91 P.2d 394; Wells v. Stanger, 123 Mont. 26, 207 P.2d 549; In re Pepin's Estate, 53 Mont. 240, 163 P. 104.

- 8 -

The district court's order denying the petition for writ of habeas corpus was correct. No prejudical error having been shown, the order of that court is affirmed.

_John Conway Harrison_
Justice

We concur:

_____

_Gene B. Daly_
Justices

_Alfred B Coate_
Hon. Alfred E. Coate, District Judge, sitting for Chief Justice James T. Harrison.

Mr. Justice Frank I. Haswell, specially concurring:

I concur in affirming the district court's dismissal of the habeas corpus petition.

The reason for this special concurrence is that I do not understand the basis of the majority holding. Is it based on the prior custody orders of the Missouri court? On the Montana adoption proceedings? On an independent adjudication of custody in the habeas corpus proceeding?

In this case neither the Missouri court nor the Montana court in the adoption proceedings had jurisdiction over the mother. She was permanently deprived of her parental rights and her children were adopted by another, all without giving her notice of the proceedings and affording her an opportunity to be heard. The ultimate merits of the case cannot correct jurisdictional defects. For this reason I would hold the Missouri custody awards and the Montana adoption proceedings void.

I would hold the independent custody adjudication of the Montana court in the habeas corpus proceeding correct and fully supported by the evidence. On this basis I would deny the petition for habeas corpus.

_Frank I. Haswell_
Justice.