No. 14885

IN THE SUPREME COURT OF THE STATE OF MONTANA

1980

---

IN THE MATTER OF THE APPLICATION OF
IRENE BERTELSON ON BEHALF OF LYNNETTE
STANLEY FOR A WRIT OF HABEAS CORPUS.

---

ORIGINAL PROCEEDING:

Counsel of Record:

For Appellant:

Francis X. Lamebull argued, Harlem, Montana

For Respondent:

Richard Ganulin argued, Great Falls, Montana

---

Submitted: December 10, 1979

Decided: SEP 17 1980

Filed: SEP 17 1980

*Thomas J. Kearney*
Clerk

Mr. Justice Daniel J. Shea delivered the Opinion of the Court.

On June 4, 1980, this Court entered its decision reversing the District Court and holding that jurisdiction of this child custody dispute was properly with the Chippewa Cree Tribe. Irene Bertelson, the mother of the child involved, promptly petitioned this Court for a rehearing.

The petition alleged that the Court relied on erroneous facts in vacating an order of the Hill County District Court directing Mr. and Mrs. Martin Stanley, the paternal grandparents of Lynette Stanley, to return the girl to the mother, the petitioner. This Court found, based on undisputed material facts before it, that the Chippewa Cree Tribal Court was a more appropriate forum for settling the private custody dispute presented in this case, involving an Indian child and Indian parties.

With respect to the allegations that this Court relied on facts not supported by the record, each of the alleged erroneous facts (with the exception of one) were taken from appellant's brief, as they were not refuted by the respondent in her own brief. The factual assertions by the Stanleys, that due to Irene Bertelson's neglect, her children had been placed in foster care in Spokane and that she had been in trouble with the police, were not disputed by Irene Bertelson in her brief. We, as an appellate court, are not required to ignore factual assertions that stand unrefuted. Cf., Lasky v. American Indemnity Co. (1929), 102 Cal.App. 192, 282 P. 974, 976; also see Saint v. Beal (1923), 66 Mont. 292, 213 P. 248, 250. This Court did state, however, that the Stanleys were not able to speak English, and this statement may not have any support. The Stanleys did not really participate

-2-

in either of the two hearings held in District Court, and it appears that a social worker spoke on their behalf. From this, we surmised that they did not speak English.

Because of the paucity of the trial court record before us, and because of the importance of this case to a claim of Indian tribal jurisdiction, we determine that the best course of action is to remand this case to the trial court so that it can develop a complete evidentiary record and make complete findings of fact and conclusions of law.

This custody dispute concerns a child born during the marriage of James Stanley and Irene Bertelson. On February 20, 1975, the natural mother was granted a divorce decree in Cascade County, and, as part of that decree obtained custody of Lynette and her sister Brenda Lee. Only Lynette's custody is involved in the present litigation. After the divorce, the mother retained custody until April 1977. At that time the grandmother went to Spokane where the mother was living and, with the mother's consent, obtained physical custody of Lynette. Since that time, the child has been living with the grandparents on the Rocky Boy Indian Reservation near Havre, Montana. Both grandparents are enrolled members of the Chippewa Cree Tribe.

Lynette is also an enrolled member of the tribe and attends school on the reservation. Although the mother went to the reservation occasionally to visit her daughter, she did not attempt to regain custody of Lynette until March 1979, when she asked the paternal grandparents to return the child to her.

The grandparents refused to return the child, and on April 4, 1979, apparently without personal notice to the mother, they obtained a temporary custody order from the Chippewa Cree Tribal Court appointing them as special guardians.

-3-

In response, the mother on April 17, 1979, filed a petition in Hill County District Court for a writ of habeas corpus. The District Court held a show cause hearing on the writ on April 30, 1979.

The record before us consists solely of the District Court file (with nothing of any help to us) and the transcript of the April 30, 1979 show cause hearing held to compel the Stanleys to show cause why they should not be required to return the daughter to Irene Bertelson, the mother. At hearing, the trial court was told of the Stanleys' inability to procure counsel. The hearing continued nonetheless. Bertelson presented evidence in support of her petition. The Stanleys did not cross-examine Bertelson nor did they present evidence in their own behalf. The trial court then continued the hearing until such time as it could rule on a request by the Stanleys for the appointment of counsel.

On May 1, 1979, the trial court issued an order stating that the grandparents were not entitled to the appointment of counsel and that the hearing would resume on May 9, 1979 to permit the Stanleys to respond further to Bertelson's petition. But the May 9 hearing never took place. The Court deemed the matter submitted on briefs. It is from this sparce record that the trial court entered its order commanding the Stanleys to return their grandchild to her mother.

In its order, of June 7, 1979, the trial court made three basic conclusions of law: (1) the Indian Child Welfare Act, 25 U.S.C. §1901, et seq., did not apply; (2) the District Court, and not the tribal court had jurisdiction; and, (3) the mother was entitled to custody of the child. In reaching its decision, the trial court set forth neither the controlling facts nor the applicable law. In short, we

-4-

do not know how this decision was reached. A trial court must set forth reasons for its rulings. Ballantyne v. Anaconda Co. (1978), ___ Mont. ___, 574 P.2d 582, 35 St.Rep. 171.

Because the welfare of an innocent young child is at stake, we are concerned that a final decision of the jurisdictional questions presented be based on accurate factual information. The question of whether the District Court should assume jurisdiction or determine that jurisdiction is more properly with the Chippewa Cree Tribe is not an easy one. For the guidance of the trial court in conducting its hearing and entering its findings of fact and conclusions of law, we include a discussion of the principles which must be considered, and we also set forth what we deem an appropriate test for determining whether the District Court should accept jurisdiction in this case or defer to the tribal court.

We first address the issues raised by the grandparents in their appeal from the District Court order. They argue that the state cannot exercise subject matter jurisdiction over this custody dispute because: (1) the Chippewa Cree Constitution and its Law and Order Code, enacted by the Tribe pursuant to the Indian Reorganization Act of 1934 (Act of June 18, 1934, 48 Stat. 984-988, as amended, 25 U.S.C. §§ 461-79) preempt state jurisdiction under the rationale of Fisher v. District Ct. (1976), 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed.2d 106; and United States v. Mazurie (1975), 419 U.S. 544, 95 S.Ct. 710, 42 L.Ed.2d 706; (2) state jurisdiction would impermissibly interfere with the tribe's inherent right of self-government contrary to the doctrine of Williams v. Lee (1959), 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251; (3) the Chippewa Cree Tribal Court has exclusive jurisdiction

-5-

pursuant to the Indian Child Welfare Act of 1978, 25 U.S.C. §§1901, et seq.; and (4) the state has not assumed, nor has the tribe ceded to the state, jurisdiction over custody matters pursuant to either Pub. L. No. 83-280 (Act of Aug. 15, 1953, 67 Stat. 588-90) or Title IV of the 1968 Federal Indian Civil Rights Act (Act of Apr. 11, 1968, 82 Stat. 79-80, 25 U.S.C. §§1321-1326.) We resolve these issues against the grandparents.

The Stanleys' argument that Congress has preempted state jurisdiction by delegating authority to the tribe in §16 of the Indian Reorganization Act to enact a constitution and bylaws is misplaced. Generally, that doctrine is liberally applied only when actions clearly arise on the reservation. See, United States v. Mazurie, supra; Fisher v. District Ct., supra.; and Mescalero Apache Tribe v. Jones (1973), 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114. Here, a number of significant events relating to the child's custody apparently occurred off the reservation. Bertelson and Stanley voluntarily invoked state court jurisdiction to dissolve their marriage. Bertelson, whom the state court awarded custody, apparently is not a member of the Chippewa Cree Tribe and does not reside on the reservation. Her daughter, Lynette, resided with her for a period of time off of the reservation. When substantial activities giving rise to a dispute arise within the state but outside of the reservation boundaries, the state may assume jurisdiction. Crawford v. Roy (1978), ___ Mont. ___, 577 P.2d 392; see, De Coteau v. District County Ct. (1975), 420 U.S. 425, 428-30 & n. 3, 95 S.Ct. 1082, 43 L.Ed.2d 300, reh.den. 421 U.S. 939, 95 S.Ct. 1667, 44 L.Ed.2d 95.

Nor does Williams v. Lee, supra, prohibit state juris-diction in this matter. The test which the United States

-6-

Supreme Court set forth in Williams was whether in litigation arising out of conduct on an Indian reservation and in the absence of a governing federal law, state jurisdiction "infringed" on the right of the Indian tribe to be self-governing. 358 U.S. at 220, 79 S.Ct. 269, 3 L.Ed.2d 251. The situs of the events giving rise to the litigation must therefore be on the reservation before Williams need apply.

As this Court held in its original opinion of June 4, 1980, the dispute does not fall within the ambit of the Indian Child Welfare Act. The Act is not directed at disputes between Indian families regarding custody of Indian children; rather, its intent is to preserve Indian culture values under circumstances in which an Indian child is placed in a foster home or other protective institution. The House Report sets forth the essential thrust of the act:

> ". . . to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by establishing minimum Federal Standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes or institutions which will reflect the unique values of Indian culture . . ." H. R. Rep. No. 95-1386, 95th Cong., 2d Sess. 21, reprinted in [1978] U.S. Code Cong. & Ad. News 7530.

The issue here is not which foster or adoptive home or institution will best "reflect the unique values of Indian culture . . ." Rather, the present case involves an internal family dispute between the mother and the paternal grandparents over the custody of the child.

We do agree with the Stanleys, however, in their contention that the provisions of the Chippewa Cree Law and Order Code have not ceded jurisdiction over custody matters to the State of Montana. The fact is 25 U.S.C. §1326 requires that a tribe hold an election to determine whether its members would consent to the assumption of civil jurisdiction

-7-

by a particular state. In this case, there has been no such election. Furthermore, Pub. L. 83-280, 67 Stat. 588-590, prior to 1968, and its amended version, as codified in 25 U.S.C. §§1322, 1324, subsequent to 1968, requires that the particular state involved also act to accept jurisdiction. This has not been done. Absent compliance by the state and by the tribe with the current federal enabling statutes, 25 U.S.C. §§ 1321-1326, regulating the extension of state civil and criminal jurisdiction to Indian country, the claim that the tribe has generally ceded jurisdiction over all child custody matters to the state cannot prevail. Blackwolf v. District Ct. (1972), 158 Mont. 523, 493 P.2d 1293, Kennerly v. District Ct. (1971), 400 U.S. 423, 91 S.Ct. 480, 27 L.Ed.2d 507.

We see no impediments in Acts of Congress which would ipso facto prevent a state court from assuming jurisdiction in this case. Nonetheless, we do not believe that the state courts should, in a case of this nature, automatically assume jurisdiction. That a state court may assume jurisdiction in a case of this nature is not to say that it should. Here we cannot ascertain how the trial court reached its jurisdictional decision. It appears, however, it merely concluded that the mother had not abandoned the child and, therefore, that ipso facto she was entitled to the child's return. This is not a proper basis for jurisdiction where the issue is a choice between state and tribal jurisdiction. Otherwise, a finding of nonabandonment would invariably defeat a claim by the tribe that it should have jurisdiction. The remainder of this opinion discusses the factors that a state District Court must consider before deciding the jurisdictional issue.

-8-

We consider first the doctrine of _forum non conveniens_ in the limited context of Indian jurisdictional cases. The doctrine generally gives a court discretionary authority to decline jurisdiction. _See_, _e.g._, Koster v. Lumbermens Mutual Casualty Co. (1947),330 U.S. 518, 527, 67 S.Ct. 828, 91 L.Ed. 1067; Gulf Oil Corp. v. Gilbert (1947), 330 U.S. 501, 507, 67 S.Ct. 839, 91 L.Ed. 1055. Ordinarily, courts apply the doctrine to refuse jurisdiction and to transfer the action to an alternate forum. _See_, _e.g._, Herbst v. Able (S.D.N.Y. 1967), 278 F.Supp., 664, 666; Grubs v. Consolidated Freightways, Inc., (D. Mont. 1960), 189 F.Supp. 404, 408. Section 40-7-108, MCA, expressly grants a court of this state authority to decline to exercise its jurisdiction if it finds that it is an inconvenient forum to make a custody determination in a particular case or that the court of another forum is more appropriate. We also note that the legislative history of the Indian Child Welfare Act specifies that state courts are to apply a "modified doctrine of _forum non conveniens_, in appropriate cases, to insure that the rights of the child as an Indian, the Indian parents or custodian, are fully protected." H. R. Rep. No. 1386, 95th Cong., 2d Sess. 21, reprinted in [1978] U.S. Code Cong. & Ad. News 7530, 7544. Although we have already stated that the Act does not apply to this case, we believe a state court should respect federal policy and consider the rights of the child and the tribe in deciding whether to accept or to decline jurisdiction.

In a case where state courts and tribal courts are competing for jurisdiction, a state court must consider conflict of law principles in making a final jurisdictional determination. Even though the welfare of the child is the primary considera-tion, obviously the interest of the jurisdiction where the

-9-

child is physically present, or where the child is domiciled must be considered.  See Restatement (Second) of Conflict of Laws §79, Comment a (1971).  A possible change in the relationship between parent and child is so important that the change should be made only by the jurisdiction which has significant ties and interests in the child and which will be best able to determine what the best interests of the child are with regard to custody.  H. Goodrich & E. Scoles, Conflict of Laws 271 (4th ed. 1964).  Writers in this field generally agree that any choice of law rules with regard to jurisdiction must give way to the child's welfare as the determinative touchstone for jurisdiction even though it is also the basis for deciding custody disputes on the merits. R. Leflar, American Conflicts of Law 492 (3rd. ed. 1977); Restatement (Second) of Conflict of Laws §79, Comment a (1971); See Sampsell v. Superior Ct. (1948), 32 Cal.2d 763, 197 P.2d 739, 748-750.  Indeed, courts do not unanimously ascribe to any choice of law rule precisely for the reason that each court tends to apply its own view of the universal rule that the prime jurisdictional consideration is the best interests of the child.  H. Goodrich & E. Scoles, Confict of Laws 272 (4th ed. 1964).

In personam jurisdiction over the parents, physical presence of the child within the forum, and the place of the child's domicile are all well-recognized bases for asserting jurisdiction in child custody cases.  Restatement (Second) of Conflict of Laws §79 (1971); Cobell v. Cobell (9th Cir. 1954), 503 F.2d 790, 794, cert.den. Sharp v. Cobell (1975), 421 U.S. 999, 95 S.Ct. 2396, 44 L.Ed.2d 666.  If a court has in personam jurisdiction over all parties to a custody dispute and the child is both physically present and domiciled in that state, all of the elements of the above tests are

satisfied, and this, of course, is the most substantial basis for assuming jurisdiction. But difficulties arise when one or more of these elements are missing. No doubt a jurisdictional determination would be facilitated if one of these tests were adopted as the exclusive test, but such an escape hatch ignores the primary question of the best interests of the child. See generally, Sampsell v. Superior Ct., supra, 32 Cal.2d at 777-778, 197 P.2d at 749.

## I.  PERSONAL JURISDICTION

In Cobell, supra, the court held that two enrolled members of the Blackfeet Tribe submitted the question of their children's custody to the judgment of the Montana state courts by voluntarily invoking the state court's jurisdiction for divorce purposes. Although the case has no precedential value in application to the present case, the court expressly recognized "the possibility that two sovereigns may enjoy concurrent jurisdiction in a custody situation." The court went on to hold, however, that concurrent jurisdiction did not exist because the Blackfeet Tribal Law and Order Code explicitly disclaimed jurisdiction over marriage, divorce and adoption, and indeed explicitly deferred to state court jurisdiction for proceedings in those areas. 503 F.2d at 795. The court determined therefore that it was faced with neither a question of the appropriate choice of law nor a question of the more convenient forum.

Unlike Cobell, this case does not involve a continuing custody dispute between the parties to divorce proceedings. Rather, we are concerned here with a dispute between a parent and the grandparents of the child. In short, this is not the type of factual situation ordinarily dealt with under the continuing jurisdiction of divorce courts.

-11-

## II. PRESENCE OF THE CHILD

The question thus remains whether either "presence" or "domicile" by itself should be a sufficient basis for the state's asserting jurisdiction over a child custody proceeding where the tribe is also asserting jurisdiction.

The basis judicial policy of protecting the child (the "parens patriae" doctrine) has led several courts to indicate that jurisdiction can be based on the "substantial presence" of the child within the state. See, e.g., In Re Duryea (1977), 115 Ariz. 86, 88, 563 P.2d 885, 887. H. Goodrich & E. Scoles, Conflict of Laws 272 (4th ed. 1964). In Finlay v. Finlay (1925), 240 N.Y. 429, 431, 148 N.E. 624, 625, Justice Cardozo explained the "parens patriae" rationale:

> "The jurisdiction of a state to regulate the custody
> of infants found within its territory does not depend
> upon the domicile of the parents. It has its origin
> in the protection that is due to the incompetent or
> helpless . . . (Citations omitted.) For this, the resi-
> dence of the child suffices, though the domicile be
> elsewhere . . . (Citations omitted.)"

In the case of In Re Cantrell (1972), 159 Mont. 66, 495 P.2d 179, this Court essentially followed this doctrine by declaring an Indian child temporarily off the reservation to be "dependent and neglected" and authorizing his adoption after an Indian tribal court on the Fort Peck Indian Reservation had already found the child to be neglected, but had later returned the child to the custody of the mother approximately one year before the state assumed jurisdiction. Cases in this area are often sui generis, but in light of recent developments of law at the federal level, we do not believe that this same result would necessarily follow today.

In its legislative findings to the Indian Child Welfare Act, Congress found that the states in exercising jurisdiction over Indian child custody matters have often failed to consider the unique cultural and social standards of the

-12-

Indian community. 25 U.S.C. §1901(5). Courts following the presence standard, on the other hand, assume that the court having the most ready access to the child can best protect the child and can best promote the child's welfare. Finlay v. Finlay, supra. Although this assumption may be generally valid, in the context of an Indian child custody dispute, "it ignores the inherent bias of a non-Indian society against Indian culture, and fails to protect the Indians' right of self-government." Note, 21 Ariz.L.Rev. 1123, 1131 (1979); see also, 25 U.S.C. §1901(5). Our goal should be to resort to the most appropriate forum rather than to the most easily accessible forum. Note, 21 Ariz.L.Rev. 1123, 1133 (1979). Furthermore, adherence to the "presence" test will undoubtedly encourage forum-shopping and thus invite contradictory decisions. It is not at all difficult to imagine that a nonprevailing party in a custody dispute tried in tribal court would be sorely tempted to relitigate the matter in state court by filing suit in state court should the child be temporarily off the reservation.

III. DOMICILE OF THE CHILD AS THE BASIS OF JURISDICTION:

Several courts have declared that they will not assume jurisdiction unless the Indian child is domiciled off the reservation. In Re Adoption of Buehl (1976), 87 Wash.2d 649, 555 P.2d 1334; Wakefield v. Little Light (1975), 276 Md. 333, 347 A.2d 228, 238; Wisconsin Potowatomies v. Houston (W.D. Mich. 1973), 393 F.Supp. 719, 731. In Wakefield, the Court declared that the domicile theory insures that "the Indian tribe is afforded significant protection from losing its essential rights of child-rearing and maintenance of tribal identity." 276 Md. at 350, 347 A.2d at 238. But we are not told how this protects the interest of the tribe if the child is living on the reservation but has domicile off the

-13-

reservation. The logical upshot of such a holding is that if the Indian child is domiciled off the reservation, state jurisdiction is exclusive regardless of the family and social ties which the child has to the tribe. Note, 21 Ariz.L.Rev. 1123, 1134 (1979).

Although the presence and domicile are handy jurisdictional rules, these tests largely ignore the ethnic identity of the child and cultural ties to the tribe. Indian tribes retain an inherent "quasi-sovereignty" which provides a safeguard against state interference in the internal tribal affairs. Thus, where the interests of an Indian tribe are involved in a custody dispute, a state court must consider the unique status which Indian tribes occupy under the law.

Long ago the United States Supreme Court in Georgia v. Worchester (1832), 31 U.S. (6 Pet.) 515, developed what is essentially a three-part analysis to determine the extent of tribal sovereignty: (1) Indian tribes originally possessed the inherent sovereignty of any independent nation; (2) the sovereignty of the Indian nations was necessarily lessened after conquest and had to yield to conflicting plenary federal authority; and (3) Indian tribes now possess the same measure of internal sovereignty they possessed before conquest except where Congress has expressly withdrawn such powers by Congressional treaty or statute. 31 U.S. (6 Pet.) at 559-561. At the same time, Indians who reside off the reservation, as a general rule have the same rights and responsibilities and are subject to the jurisdiction of state courts in the same manner as state citizens. Mescalero Apache Tribe v. Jones (1973), 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114.

The problem is to decide what the dual status of the Indian as a state citizen, on the one hand, and as a quasi-independent

-14-

sovereign, on the other, means in the context of a particular dispute between tribal and state jurisdiction. In Wisconsin Potowatomies, supra, the Court stated the essential query:

> "If then, Indians are to be accorded such independence and sovereignty within the limits of their reservation, and if on the other hand, they subject themselves to the benefits and obligations of state law when without, the question becomes at what point the transformation from one to the other is accomplished." 393 F.Supp. at 730.

We have found no law which strikes the balance in a factual situation sufficiently analogous to that presented here. Williams v. Lee, supra, held that states were permitted to act only "where essential tribal relations were not involved and where the rights of Indians would not be jeopardized." 358 U.S. at 219-20, 79 S.Ct. 269, 3 L.Ed.2d 251. In Wakefield, supra, the Court held that child rearing is an "essential tribal relation within the Williams test." 276 Md. at 343, 347 A.2d at 234. While jurisdiction over child custody matters arising on the reservation between reservation Indians is exclusive to the tribe, Fisher, supra, there appears to be significant developments here relating to custody which have occurred both off and on the reservation.

Arguably, either the state or the tribe could assert jurisdiction. The question is to determine which forum is better able to determine the best welfare of the child--the controlling principle for determining jurisdiction. We do not believe a simple arithmetic tallying of off-reservation versus on-reservation contacts is sufficient to determine jurisdiction. Like the "presence" test and the "domicile" test, it is too mechanical and formalistic and by itself obscures the best interest of the child. This approach also ignores significant tribal interests in custody matters which cannot be translated into geographic terms. As the

-15-

Court stated in Wisconsin Potowatomies v. Houston, supra:

> "If tribal sovereignty is to have any meaning at
> all at this juncture of history, it must necessarily
> include the right, within its own boundaries and
> membership, to provide for the care and upbringing
> of its young, a sine qua-non to the preservation of
> its identity." 393 F.Supp. at 730.

An assumption of state court jurisdiction over Indian
child custody disputes poses a substantial risk of conflicting
decisions which potentially threaten a decline in tribal
authority. Different cultural views of parental responsibility
are likely to be reflected by the ultimate custody determinations
of tribal and state courts. To assume jurisdiction based
solely on the location of the child or his parents or of
various activities  is to ignore the importance of ethnic
heritage and customs. Presumably the tribal court is better
equipped to consider the ethnic identity as a factor in
determining the child's welfare than is a state court. We
note in this respect, that the jurisdictional model of the
Indian Child Welfare Act is not predicated on geographic
factors, but rather on the ethnic identity and tribal ties
of the child. 25 U.S.C. 1911.

We conclude that to properly consider tribal interests
in child custody that go beyond reservation boundaries, the
best means to arrive at a considered decision as to whether
a state court should accept or decline jurisdiction  is to
balance the state interests in taking jurisdiction against
the tribal interest in assuming jurisdiction. The state may
assert jurisdiction in an Indian child custody dispute of
this sort if, upon balance, it appears that the state's
contacts with and interest in the child and the parties are
more substantial than those of the tribe. The state might,
for example, appropriately take jurisdiction of a custody
proceeding involving an Indian child whose parents have
raised him off the reservation without appreciable contacts

-16-

to tribal life. Presumably, such a child, while ethnically an Indian, would be culturally disassociated from the tribe by the free choice of his parents. A balancing of the state and tribal contacts might lead a state court to conclude that it is better able to determine the child's welfare. In such case, the child's best interests would probably be served by applying the concepts of parental fitness of the culture in which the child has been immersed.

Upon rehearing of this case to determine whether or not it should assume jurisdiction, the trial court must inquire into the contacts of the child, and the parties to the state and to the tribe. It should consider the tribe's interest in deciding the custody of one of its members and must record such inquiries of fact and make appropriate conclusions of law directed at the question of which forum is better suited to determine the child's welfare.

In balancing the state and tribal interests, the trial court should look to the statutory guidelines of sections 40-4-211, 40-4-102, 40-4-107 and 40-7-108, MCA. The choice of law principles--physical presence of the child, domicile and in personam jurisdiction over the parties--while not determinative in themselves, are also pertinent inquiries in determining the ultimate question of whether or not to assume jurisdiction.

The trial court should also inquire into the following factual and legal matters which may affect a determination of which is the better forum to ascertain the best interest of the child: the existence of tribal law or tribal customs relating to child care and custody in cases of this sort; the nature of the child's personal relationship with her grandparents and with her mother; the child's assimilation into and adjustment to life in the tribe and on the reservation; the mother's ethnic and cultural background and membership

-17-

in or ties to the Chippewa Cree Tribe or any other tribe; the length of the child's residence both on and off the reservation; the domicile and residence of the child's father and the child's personal relationship with her father.

The focus of the evidentiary hearing should be to determine which forum is better equipped to make a determination on the merits, that is, to determine the child's best interests. Due consideration should be given to the child's ethnic and cultural identity.

Upon reversal or vacation of a lower court order or judgment in a habeas corpus proceeding involving child custody, an appellate court may remand the cause for the determination of a particular issue by means of an evidentiary hearing. 39A C.J.S. Habeas Corpus §260 (1976); see, e.g., Elmore v. Elmore (1977), 46 Ill.App.3d 504, 361 N.E.2d 615, 617-618; Slawek v. Covenant Children's Home (1972), 52 Ill.2d 20, 284 N.E.2d 291, 292; Langenber v. Steen (1958), 213 Or. 150, 322 P.2d 1087, 1088.

A remand for further proceedings accords with the general nature of habeas corpus actions in the child custody context. In this state, habeas corpus proceedings involving child custody matters are essentially special proceedings of a civil nature to enforce private rights; the petitioner is considered the plaintiff and the adverse party, the defendant; and the disposition made by the lower court is a final judgment from which an appeal lies. In Re Thompson (1926), 77 Mont. 466, 470, 251 P. 163, 164-165. Because habeas corpus proceedings involving child custody are also considered as being equitable in nature, Conley v. Walden (1975), 166 Mont. 369, 375, 533 P.2d 955, 958, the child's welfare, rather than the technical legal rights of the parent, is the paramount consideration by which the court must be guided.

-18-

Conley, supra, 166 Mont. at 375, 533 P.2d at 958; Burns v. Groshelle (1957), 131 Mont. 1, 6, 306 P.2d 675, 677-678; Wells v. Stranger (1949), 123 Mont. 26, 33, 207 P.2d 549, 552; Veach v. Veach (1948), 122 Mont. 47, 53, 195 P.2d 697, 700; In Re Thompson, supra, 77 Mont. at 475-476, 251 P. at 166. Thus, habeas corpus is merely a procedural device to bring custody matters before the court. Smart v. Cantor (1977), 117 Ariz. 539, 574 P.2d 27, 29.

We vacate the judgment of the District Court and remand this case to the District Court for further proceedings in accordance with this opinion. Our previous opinion in this case (In the Matter of Bertelson, Cause No. 14885, decided June 4, 1980) is withdrawn.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____
Justices

-19-