No. 92-491

IN THE SUPREME COURT OF THE STATE OF MONTANA

1993

THE STATE OF MONTANA,

Plaintiff and Respondent,

v.

RUBEN HORSEMAN,

Defendant and Appellant.

FILED

DEC 27 1993

~~~ Smith
~~~ OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM: District Court of the Twelfth Judicial District,
In and for the County of Hill,
The Honorable John Warner, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Lawrence A. LaFountain, Attorney at Law,
Havre, Montana

For Respondent:

Hon. Joseph P. Mazurek, Attorney General,
Carol Schmidt, Assistant Attorney General,
Helena, Montana

David G. Rice, Hill County Attorney, Havre,
Montana; Brian Lilletvedt, Special Prosecutor,
Havre, Montana

Submitted on Briefs: August 26, 1993

Decided: December 27, 1993

Filed:

_____
Clerk

Justice Fred J. Weber delivered the Opinion of the Court.

This is an appeal from the Twelfth Judicial District Court, Hill County, affirming a charge of possession of an unlawfully killed game animal in violation of § 87-3-111(1), MCA, against Ruben Horseman. We affirm.

We restate the issues on appeal:

1. Did the District Court err in determining that Ruben Horseman, an enrolled tribal member of the Fort Belknap Indian Reservation, had possession of an illegally killed bighorn sheep?

2. Did the District Court err in determining that it had jurisdiction to rule in Horseman's case?

3. Did the District Court properly conclude that no evidence was presented that demonstrated that any established Rocky Boy's Indian Reservation's extradition procedures were violated or that extradition was, in fact, required?

On October 21, 1990, Game Warden Mark Earnhardt (Earnhardt) of the Montana Department of Fish, Wildlife and Parks, observed a truck traveling west on a county road in Hill County. The truck had blood runs on the tailgate and was headed for the Rocky Boy's Reservation. Unable to pursue the vehicle because he was behind a locked gate, Earnhardt radioed Tribal Warden Matt Denny (Denny) on the Rocky Boy's Reservation for assistance in stopping the vehicle.

Both parties indicate that upon entering the reservation, Ruben Horseman (Horseman) was stopped by Denny who discovered a freshly killed bighorn sheep in the back of Horseman's suburban. Upon his arrival, Earnhardt issued Horseman citations for possessing an unlawfully killed bighorn sheep, transporting an unlawfully killed bighorn sheep and taking a bighorn sheep without a license.

These charges were brought in Justice Court for Hill County. Horseman's motion to dismiss the charge of taking of a bighorn sheep was granted by the court because Hill County was an improper venue for a crime committed outside of the county. The record indicates that the sheep was killed in Blaine County. The remaining two charges, possessing and transporting an illegally killed game animal were tried to a jury which found Horseman guilty of both charges on November 13, 1991. Horseman was fined $500, ordered to pay $2,000 restitution and had his hunting privileges suspended for thirty months.

Horseman appealed this judgment to the Twelfth Judicial District Court. He filed a pretrial motion to dismiss the charges against him. The District Court granted Horseman's motion to dismiss the charge of transporting an illegally killed game animal but denied dismissal of the charge of possession of such animal.

On July 17, 1992, Horseman entered a conditional plea of "guilty" pursuant to § 46-12-204, MCA, for the charge of possession of an unlawfully killed game animal in violation of § 87-3-111(1), MCA. Horseman's conditional plea contained three issues which were subject to appeal:

1. That he had the legal right to kill the animal pursuant to the 1855 Treaty between his tribe, the Gros Ventre, and the United States;

2. That he was unlawfully arrested on the Rocky Boy's Reservation; and

3. That he was unlawfully extradited from the Rocky Boy's Reservation.

The District Court accepted Horseman's plea and found him guilty of possession of an unlawfully killed game animal in violation of § 87-3-111(1), MCA, fined him $500 and suspended his hunting privileges until January 23, 1995. Horseman filed a notice of appeal on August 20, 1992.

I

Did the District Court err in determining that Ruben Horseman, an enrolled tribal member of the Fort Belknap Indian Reservation, had possession of an illegally killed bighorn sheep?

Horseman argues that 1851 and 1855 Treaties between the Gros Ventre Tribe and the United States reserved the tribal rights to hunt in traditional hunting grounds. According to Horseman, because he killed the sheep on federal land, he is not subject to State regulations.

The State argues that neither the 1851 or 1855 Treaty, nor any subsequent agreement affecting the Gros Ventre Tribe and the Fort Belknap Treaty, reserved a right for tribal members to hunt on ceded land, or other off-reservation land.

Generally, states have jurisdiction to regulate the wildlife within their borders. Baldwin v. Fish & Game Comm'n (1978), 436 U.S. 371, 98 S.Ct. 1852, 56 L.Ed.2d 354. Tribal members are subject to these state laws when they are off-reservation, unless off-reservation hunting and fishing rights have been expressly reserved by the tribe when they ceded lands to the federal government. Oregon v. Klamath (1985), 473 U.S. 753, 105 S.Ct. 3420, 87 L.Ed.2d 542. Therefore, in order for the Gros Ventre Tribe, and hence Horseman, to have the right to be free from state

4

fish and game regulations while hunting off-reservation, the treaties made between the tribe and the United States must specifically reserve this off-reservation privilege.

We note that Horseman mentioned only the 1855 Treaty when he made his conditional plea. He now argues both the 1851 and 1855 Treaty. Neither treaty provides the reservation he argues.

The Treaty of Fort Laramie was signed in 1851 by the United States and various tribes, including the Gros Ventre. The purposes of the 1851 Treaty were to assure safe passage for settlers across lands of various Indian tribes, to compensate tribes for loss of buffalo, other game animals, timber and forage, to delineate tribal boundaries, to promote intertribal peace and to establish a way of identifying Indians who committed depredations against non-Indians. Montana v. U.S. (1981), 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493; Treaty of Fort Laramie, Act of September 17, 1951, 11 Stat. 749. The tribes agreed to stay in their respective territories.

Article 5 is a tribe-by-tribe list of each tribe's respective territory. At the end of this article is the following paragraph:

> It is, however, understood that, in making this recognition and acknowledgement, the aforesaid Indian nations do not hereby abandon or prejudice any rights or claims they may have to other lands; and _further, that they do not surrender the privilege of hunting, fishing, or passing over any of the tracts of country heretofore described._

The phrase "heretofore described" limits the tribal hunting privilege to that tract of land specified for each tribe. The tribes' respective territories, however, continued to get smaller during subsequent treaties.

5

In 1855, a treaty with the Blackfeet Nation, of which the Gros Ventre was a tribe, set the boundaries of the Blackfeet territory and established a common hunting ground for 99 years. Treaty with the Blackfeet, Act of October 17, 1855, 11 Stat. 657. This is an express reservation for 99 years - which would have ended in 1954. Despite subsequent treaty documents which diminished tribal lands, the hunting privilege would have been retained on this larger tract of land only until 1954, unless expressly revoked before the 99 years had elapsed.

In 1874, the 43rd Congress set up a reservation for the Gros Ventre, Piegan, Blood, Blackfeet and River Crow. Act of April 15, 1874, 18 Stat. 28. The reservation which was set up during the first session of the 43rd Congress in 1874, was reduced in size by the 50th Congress in 1888. Act of May 1, 1888, 25 Stat. 113. Article II of Chapter 213, published in 1888, states that:

> The said Indians hereby cede and relinquish to the United States all their right, title, and interest in and to all the lands embraced within the aforesaid Gros Ventre, Piegan, Blood, Blackfeet and River Crow Reservation, not herein, specifically set apart and reserved as separate reservations for them, and do severally agree to accept and occupy the separate reservations to which they are herein assigned as their permanent homes, and they do hereby severally relinquish to the other tribes or bands respectively occupying the other separate reservations, all their right, title, and interest in and to the same, reserving to themselves only the reservation herein set apart for their separate use and occupation.

What followed was the boundaries for the Fort Peck and Fort Belknap reservations. Nothing in Chapter 213 refers to hunting.

Again, in 1896, an agreement was signed between the United States and the Indians of the Fort Belknap Reservation, 54th

6

Congress, Session I. Act of June 10, 1896, Chapter 398, 29 Stat. 350. In this agreement, the Indians once again ceded land to the United States for which they received payment. Nothing in this chapter reserved hunting rights on lands ceded.

Of all the treaties and subsequent amendments, only the 1855 Treaty reserves hunting rights to common hunting grounds. That reservation was for 99 years only and has now been extinguished.

Horseman cites State v. Stasso (1977), 172 Mont. 242, 563 P.2d 562, as precedent for the fact that he as a tribal member is permitted to hunt in "open and unclaimed" lands off the reservation. Stasso interpreted a treaty with the Salish and Kootenai tribes and is not precedent for a separate treaty with the Gros Ventre.

Stasso involved an interpretation of the Treaty of Hell Gate, signed in 1855. The tribes involved in the Hell Gate Treaty specifically reserved the right to hunt and fish in open and unclaimed areas:

> The exclusive right of taking fish in all the streams running through or bordering said reservation is further secured to said Indians; as also the right of taking fish at all usual and accustomed places, in common with citizens of the Territory, and of erecting temporary buildings for curing; together with the privilege of hunting, gathering roots and berries, and pasturing their horses and cattle upon open and unclaimed land. (Emphasis added.)

Article II, Treaty of Hell Gate, Act of July 16, 1855, 12 Stat. 975. The Stasso case interprets "open and unclaimed lands" to include National Forests, where the particular animal in question was killed.

7

The treaties involved in the case before us do not contain such wording. The 1855 Treaty with the Blackfeet Nation contains the only express reservation of hunting rights and that reservation of rights ended in 1954. Therefore, Horseman was subject to the State game laws while off the reservation.

We hold that the District Court did not err in determining that Ruben Horseman had possession of an illegally killed big horn sheep.

II

Did the District Court err in determining that it had jurisdiction to rule in Horseman's case?

Horseman argues that the District Court had no jurisdiction to rule in this case because he is a tribal member and the offense took place on tribal land. The State argues that the offense occurred off the reservation and that Horseman was voluntarily placed in State custody by tribal authority.

Horseman filed a pretrial motion with the District Court to dismiss his case for lack of personal jurisdiction to rule on the case. The court denied the motion. Horseman then entered a conditional guilty plea to the District Court pursuant to § 46-12-204(3), MCA:

> With the approval of the court and the consent of the prosecutor, a defendant may enter a plea of guilty, reserving the right, on appeal from the judgment, to review the adverse determination of any specified pretrial motion. If the defendant prevails on appeal, the defendant must be allowed to withdraw the plea.

Horseman's pretrial motion was one to dismiss for lack of jurisdiction. We review a district court decision of denial of a

8

motion to dismiss as to whether the court abused its discretion. Gold Reserve Corp. v. McCarty (1987), 228 Mont. 512, 744 P.2d 160.

Horseman, as defendant, had the burden of proving to the court that the alleged offense was committed at a location which deprived the State of jurisdiction to prosecute. Stasso, 172 Mont. at 248, 563 P.2d at 565. The record is devoid of any evidence to indicate that the offense for which Horseman is charged occurred on his own reservation, thus denying Hill County jurisdiction. While Horseman argues that the offense occurred on the reservation, statements included in an appellate brief but which are not in the record will not be considered on appeal. Credit Associates v. Harp (1990), 243 Mont. 281, 794 P.2d 343.

The only hard evidence that exists in this file is found in the three original tickets issued by Earnhardt to Horseman. Those tickets state that all three alleged offenses occurred in Hill County, at a location off the Rocky Boy's reservation. When disputes involving Indians arise within the state but outside of Indian reservation boundaries, the state may assume jurisdiction over the matter. Application of Bertelson (1980), 189 Mont. 524, 617 P.2d 121. Horseman has provided no evidence that jurisdidction lay with another sovereign other than the State of Montana.

Further, Horseman was not a member of the tribes included within the Rocky Boy's Reservation; he is a member of the Gros Ventre tribe living on the Fort Belknap Reservation. He is, for purposes of this action, a "non-member" Indian on the Rocky Boy's Reservation where he was detained. At the time of Horseman's

9

crime, Indian tribes lacked misdemeanor criminal jurisdiction over non-member Indians. Duro v. Reina (1990), 495 U.S. 676, 110 S.Ct. 2053, 109 L.Ed.2d 693. Rocky Boy's tribes, therefore, had no jurisdiction for Horseman's misdemeanor crime because Horseman was a member of another tribe from the Fort Belknap Reservation.

Duro has now been superseded by federal statute reinstating a tribe's misdemeanor criminal jurisdiction over non-members. That reinstatement did not take effect, however, until October 18, 1991. The crime with which we are concerned took place in October of 1990, a full year before the tribes regained their misdemeanor criminal jurisdiction over non-member Indians. See Act Nov. 5, 1990, P.L. 101-511, § 8077(d), 104 Stat. 1893; Oct. 9, 1991, P.L. 102-124, § 1, 105 Stat. 616, was repealed by Act Oct. 28, 1991, P.L. 102-137, § 1, 105 Stat. 646.

We conclude that the District Court had proper jurisdiction to rule in this case. Therefore, we hold that the District Court did not err in assuming jurisdiction over Horseman's case.

III

Did the District Court properly conclude that no evidence was presented that demonstrated that any established Rocky Boy's Indian Reservation's extradition procedures were violated or that extradition was, in fact, required?

Horseman argues that he was illegally transported off the reservation. His contention is that the Rocky Boy's Tribal extradition procedures were not used. The State contends that the act of possessing and transporting an illegally killed game animal occurred off the reservation in Hill County and that Horseman's

10

arrest and subsequent exit from the reservation occurred with the complete cooperation of tribal authorities.

The District Court determined that Horseman's arrest occurred with the help and cooperation of tribal authorities. The court then determined that no evidence was presented by Horseman that Rocky Boy's extradition procedures were violated or that extradition was even required.

Both parties to this action have failed to present to this Court or to the lower court any of the appropriate case law upon which this case must be decided. Three months before Horseman illegally killed the big horn sheep, the United States Supreme Court in a well publicized opinion stated that:

> [the] assertion of jurisdiction by the Tribe over an Indian who was not a member would violate the equal protection guarantees of the Indian Civil Rights Act.

Duro, 110 S.Ct. at 2058. The Duro Court went on to hold that:

> Indian tribes lack jurisdiction over persons who are not tribe members.

Duro, 110 S.Ct. at 2059. Thus, according to the law at the time of the crime, the Rocky Boy's tribes had no misdemeanor criminal jurisdiction over Horseman, a member of the Fort Belknap Reservation.

Although the Duro decision has been superseded by statute, the decision is still good law as it involves tribal sovereignty. The case has been cited as precedent for the proposition that:

> Where jurisdiction to try and punish an offender rests outside the tribe, tribal officers may exercise their power to detain the offender and transport him to the proper authorities.

11

Duro, 110 S.Ct. at 2066. See Primeaux v. Leapley (S.D. 1993), 502 N.W.2d 265, 270, and State v. Schmuck (Wash. 1993), 850 P.2d 1332, 1339.

Here, the State offered the Primeaux decision in a "Notice" filed at the eleventh hour on November 12, 1993. The notice was an attempt to present this Court with additional "recent" authority in the Horseman case. The "recent" Primeaux decision cited by the State was actually decided in June of 1993, two months before the Horseman action was filed in this Court. It was presented to the Court three months after the August, 1993, filing date of the last brief on appeal. The State's "Notice" is inappropriate. It does more than simply add a more "recent" authority on an already argued legal theory--it adds a totally new legal argument to the case, heretofore unmentioned in either party's court documents.

In its appellate briefs, neither party argued the Duro decision which was relied on by the Primeaux court. Nor did either party attach any importance to Horseman's non-member status at the time of the crime. Neither party mentions tribal sovereignty. The only issue argued on appeal is extradition and whether it was needed or not.

The underlying issue in this case is not whether the formal procedures for extradition were needed or applied correctly, but whether the Rocky Boy's warden as an officer of the tribe had the jurisdiction under the facts of this case to cooperate with Earnhardt and detain Horseman. The United States Supreme Court has stated that the tribes also possess their traditional and

12

undisputed power to exclude persons whom they deem to be undesirable from tribal lands. Brendale v. Confederated Tribes & Bands of the Yakima Nation (1989), 492 U.S. 408, 109 S.Ct. 2994, 106 L.Ed.2d 343. Subsequent to Brendale, the Duro Court stated that:

> Tribal law enforcement authorities have the power to restrain those who disturb public order on the reservation, and if necessary, to eject them.

Duro, 110 S.Ct. at 2065-2066.

Earnhardt radioed Denny that the suspect was approaching the reservation and that he could not get to him before he entered the reservation. Earnhardt asked for Denny's help in stopping the suspect whom he suspected had possession of an illegally killed big horn sheep. Denny stopped Horseman, discovered the sheep, and detained Horseman for several minutes until Earnhardt arrived. We conclude that under the precedent concerning sovereignty of a tribe, the Rocky Boy's warden acted appropriately within his tribal jurisdiction by detaining and then relinquishing Horseman to Hill County authorities.

We conclude that Horseman has offered no evidence that would indicate that the Chippewa-Cree tribal code applies to the facts of this case. The facts show that a tribal officer detained Horseman upon request from Earnhardt and that according to fundamental principles of tribal sovereignty, the tribal officer had authority to relinquish Horseman to Earnhardt. The record indicates that any consideration of extradition is extraneous to the facts of this case.

13

We hold the District Court properly concluded that no evidence was presented that demonstrated any established Rocky Boy's Indian Reservation extradition procedures were violated or that extradition was, in fact, required.

Affirmed.

/s/ _____
Justice

We Concur:

/s/ _____
Chief Justice

/s/ John Conway Harrison ____

/s/ Karla M. Gray _____

/s/ _____

/s/ _____
Justices

Justice Terry N. Trieweiler dissenting.

I dissent from that part of the majority opinion which concludes that Ruben Horseman's arrest by a Montana Game Warden did not violate the extradition laws of the Rocky Boy's Reservation.

The Chippewa-Cree Law and Order Code, Title IV, Part 1, Section 1.12, provides in relevant part that:

> (2) An alleged fugitive may not be turned over to state or federal authorities until after the person has been afforded a hearing in Tribal Court to determine whether probable cause exists as to the allegation of a crime by that person.

The District Court ignored the tribal extradition law based on its erroneous conclusion that it had no evidence that the Tribe's extradition rules had been violated. However, Rule 202(d), M.R.Evid., provides that:

> A court shall take judicial notice:
>
> (1) of the common law, constitutions and statutes of the United States and of this and every other state, territory and <u>jurisdiction</u> of the United States. [Emphasis added].

The Rocky Boy's Reservation is a jurisdiction within the United States and the District Court had an obligation to take judicial notice of the extradition procedure provided for in its Law and Order Code.

The majority opinion disposes of Horseman's invocation of the Tribe's extradition procedure based on decisions which have nothing to do with this issue. The U.S. Supreme Court's ill-advised decision in *Duro v. Reina* (1990), 495 U.S. 676, 110 S. Ct. 2053, 109

15

L. Ed. 2d 693, dealt with a tribe's authority to prosecute non-members for misdemeanors committed on the reservation. It had nothing to do with the Tribe's authority to establish reasonable extradition procedures for those who commit crimes elsewhere but are apprehended on the reservation.

Neither is the fact that tribes have undisputed authority to exclude undesirable people from their land relevant. The fact in this case is that the Tribe has established a procedure by which undesirable people may be excluded, and it was not followed. The fact that a tribal law enforcement officer participated in the violation of the Tribe's extradition procedure makes no difference. It was still violated, and its violation was an infringement on the sovereignty of the Rocky Boy's Reservation. Such infringement should not be tolerated, and this fact alone is a sufficient basis for invalidating Horseman's arrest.

I agree with the decision of the Ninth Circuit Court of Appeals in *Arizona ex rel. Merrill v. Turtle* (9th Cir. 1969), 413 F.2d 683, when it held that the State of Arizona could not ignore the Navajo Tribe's extradition laws. In that case, the Ninth Circuit stated that:

> We have been referred to no specific Congressional action limiting the power of the Navajo tribal government to deal with the extradition of Indians resident within the Reservation or granting to the State of Arizona the authority to exercise extradition jurisdiction over such residents. In these circumstances, Arizona's right to exercise the jurisdiction claimed must be determined in light of whether such exercise would "infring[e] on the

16

right of reservation Indians to make their own laws and be ruled by them," (Williams v. Lee, supra at p. 220 of 358 U.S., at p. 271 of 79 S.Ct.) or, as the Williams' test was characterized by the court in Kake, Organized Village of v. Egan, 369 U.S. 60, 82 S.Ct. 562, 7 L.Ed.2d 573 (1961), "whether the application of that law would interfere with reservation self-government." *Id.* at p. 67, 82 S.Ct. at p. 567.

Applying these considerations, we conclude that Arizona's exercise of the claimed jurisdiction would clearly interfere with rights essential to the Navajo's self-government. The essential and intimate relationship of control of the extradition process to the right of self-government was recognized long ago in Kentucky v. Dennison, 24 How. 66, 16 L.Ed. 717 (1861), holding that there is no power, state or federal, to compel a state to perform its constitutional duty of extradition.

. . . .

In 1956, the Navajo Tribal Council, the tribal legislative body, adopted a Resolution providing procedures for Indian extradition. . . . The Tribe has thus codified and does now exercise its extradition power. This power cannot now be assumed by or shared with the State of Arizona without "infring[ing] on the right of reservation Indians to make their own laws and be ruled by them." Williams v. Lee, supra at p. 220 of 358 U.S., at p. 271 of 79 S.Ct. [Footnote omitted].

*Merrill*, 413 F.2d at 685-86.

Likewise, we have been referred to no federal action which would limit the right of the Rocky Boy's Reservation to deal with the extradition of individuals found and arrested on tribal land for crimes which were committed elsewhere. To limit that authority by judicial decision, as the majority has done, clearly interferes with the rights essential to the Tribe's self-government. Therefore, I dissent from that part of the majority opinion which concludes that Horseman's arrest was not illegal because it did not

17

violate the extradition procedures established by the Chippewa-Cree Law and Order Code.

_____
Justice

Justice William E. Hunt, Sr., joins in the foregoing dissent.

_____
Justice

18

December 27, 1993

## CERTIFICATE OF SERVICE

I hereby certify that the following order was sent by United States mail, prepaid, to the following named:

Lawrence A. LaFountain
Attorney at Law
P.O. Box 1532
Havre, MT 59501

Hon. Joseph P. Mazurek, Attorney General
Carol Schmidt, Assistant
Justice Bldg.
Helena, MT 59620

David G. Rice
Hill County Attorney
P. O. Box 912
Havre, MT 59501-0912

Brian Lilletvedt
Special Prosecutor
P.O. Box 7152
Havre, MT 59501

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY: _Rex N. Renk_
Deputy